Littleton, Judge,
delivered the opinion of the court:
Plaintiffs, as prime contractors, have brought this suit on behalf of their subcontractor to recover additional costs incurred by the subcontractor under a Government contract which provided for the construction of a 230,000-volt, double- *98 circuit, steel tower transmission line, approximately 18.3 miles long, within the Bureau of Eeclamation’s Central Valley Project in California.
After work had commenced on the contract, a storm of unusual severity occurred along the entire length of the Central Valley in California, resulting in unusually heavy rainfall in the headwater areas in all of the streams having their sources in the Sierra Nevada Mountains. On three different occasions the American Eiver overflowed its banks and caused a serious flood in the area where the contract work in question was in progress. The flood stream carried vast quantities of debris and caused considerable damage to the contract work. Excavations for footings were filled with silt, and the backfill around other footings was washed away. Stub angles were bent and steel members were bent or lost.
The repair of the steel towers and the unassembled components thereof was made by the firm of Carrico & Gautier, a partnership, with whom plaintiffs had subcontracted for the erection of the steel towers. Exclusive of any allowance for overhead and profit, the total cost incurred by the subcontractor in repairing this damage caused by the flooding waters is found to be $14,555.56. Finding 24. Plaintiffs seek judgment in this amoulit.
The Government defends on two grounds: First, that plaintiffs, having failed to show a liability on their part to the subcontractor, cannot recover on the latter’s behalf in this suit. Defendant relies on the decisions of this court in Nils P. Severin v. United States, 99 C. Cls. 435, cert. denied 322 U. S. 733, and in the Continental Illinois National Bank & Trust Co. v. United States cases, 112 C. Cls. 563; and 121 C. Cls. 203, cert. denied 343 U. S. 963. Second, that under Article 10 of the contract (finding 11) plaintiffs were bound to replace or repair at their own expense any work or materials that were damaged by the flood.
The above decisions hold that there can be no recovery by the prime contractor on behalf of the subcontractor in the absence of a showing that the prime contractor is in turn liable to the subcontractor on the claim asserted against the Government. Defendant alleges that no such showing has *99 been made and points to the following provision of the subcontract which it argues shows the contrary:
The Subcontractor shall hold and save the Contractor harmless from any liability for damage to the said work, or for injury or damage to persons or property occurring on or in connection therewith.
Plaintiffs first contend that despite the above provision they are liable to the subcontractor under the subcontract for the damage suffered here, and in the alternative rely on United States v. Blair, 321 U. S. 730, 737, where recovery by the prime contractor on behalf of the subcontractor was allowed even though the subcontract did not expressly provide that the prime contractor was liable to the subcontractor on the claims there made against the Government.
Certiorari was denied in the last of the above-cited Continental Illinois National Bank & Trust Co. cases after the Supreme Court’s decision in the Blair case. The holdings can be reconciled on the ground that if the subcontract is silent on the question of non-liability of the prime contractor then recovery can be had by the prime contractor on behalf of the subcontractor but where the subcontract expressly negates any liability of the prime contractor to the subcontractor then recovery on behalf of the subcontractor cannot be allowed.
The above-quoted provision relied on by the defendant might appear on first reading to relieve the contractor from liability to the subcontractor. Yet, under the prime contract, paragraph 58 of the specifications entitled Handling and transportation of steel” (Italics ours), the repair of material damaged due to no fault of the contractor is to be treated as extra work and the subcontract provides that the contractor will pay the subcontractor for extra work “as and when it is paid therefor by the Principal [Government].” The effect of this provision is to condition the liability of the prime contractor to the subcontractor, with respect to extra work, on whether or not it succeeds in receiving payment from the Government. Such a condition is not an unusual or unreasonable one, and as a practical matter is perhaps the best that a subcontractor could hope to obtain from the prime contractor. Under it, together with Article X (finding 15) *100 of the subcontract, the prime contractor is obligated to proceed against the Government on behalf of the subcontractor on any claim for extra work which the latter may have relative to the contract work. This, we hold, includes recourse to the courts where the claims are not settled administratively.
With respect to the merits of the claim, plaintiffs point to the language in the specifications, paragraph 25, which provide that the contractor
will be charged, as hereafter provided in this paragraph, for any material lost or damaged after delivery, except as otherwise specifically provided in these specifications.
The plaintiffs next direct the court’s attention to the following sentence in paragraph 58 of the specifications:
The contracting officer may order the contractor to repair material which is damaged due to no fault of the contractor and payment therefor will be made as extra work under the provisions of article 5 of the contract * * *.
Thus, plaintiffs allege that since the damage sustained was neither the fault of the subcontractor nor themselves, the above provisions require that they be reimbursed by the Government for the cost of repairing the flood damage.
With respect to paragraph 58 of the specifications, defendant takes the position that it is intended to deal only with the handling and care to be used in the transportation of the components of the steel towers, and places the contractors on notice that they may be required to make certain repairs as extra work with respect to the tower steel furnished by defendant which may be damaged in transit or in handling prior to actual delivery to the contractors.
We are of the opinion that there has been no breach by the Government. The specification relied upon contemplates that the contracting officer may order the contractor to repair material which is damaged due to no fault of the contractor and that “payment therefor will be made as extra work under the provisions of article 5 of the contract.”
The replies by the defendant to plaintiffs’ letters requesting additional compensation soon after the flooding show no such recognition of liability as for extra work on the *101 part of the contracting officer. Finding 6. Article 5 of the contract dealing with extras, and which is specifically referred to in the specification, provides that “no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer * * Plaintiffs were directed to proceed with the contract work, which indeed they were required to do under the contract, and were informed that their requests would be considered as a claim for additional compensation to be dealt with after the completion of the contract.
The repair of the type of damage sustained here is not generally regarded as extra work, and we do not believe that a provision, such as that found in the contract specifications, which provides that the contracting officer may treat the repair of certain damaged material as extra work, is subject to an interpretation which would make the Government accountable for the repair of damage which happens not to be the fault of the contractor. While the damage might have occurred while the materials were being transported or handled, the damage in question actually occurred to the steel towers and materials therefor after delivery (paragraph 25 of the specifications) and not while the materials used to build the towers were in the process of being transported or handled as provided in paragraph 58 of the specifications. Therefore, the exception to the general provisions that the plaintiff must bear the cost of repair to materials furnished by the Government where the damage occurs after delivery, which exception appears in paragraph 58 of the specifications and has a limited application, does not serve to place on the Government the obligation to pay for the repair of the materials damaged under the particular facts of this case.
Nor do we find merit in plaintiffs’ attempted distinction between the words “responsible” and “liable”, or their assertion that liability should rest with the Government apart from what the contract may have provided because the materials were supplied by it and the work was done on government-owned land.
Plaintiffs’ petition will be dismissed.
It is so ordered.
*102 Laramoee, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes the following findings of fact:
1. The plaintiffs, Donovan Construction Company and James Construction Company, are Minnesota corporations with offices in St. Paul.
2. On February 21, 1950, plaintiffs as joint venturers entered into a written contract with the defendant, acting through the Chief Engineer of the Bureau of Beclamation as contracting officer, whereby, for a stated consideration, plaintiffs agreed to erect a 230,000-volt, double-circuit, steel tower transmission line, approximately 18.3 miles long, in the County of Sacramento, California. The transmission line, which was designated as the Elverta-Perkins Line, is located within the Central Valley Project of the Bureau of Beclamation.
3. The contract consisted of the standard form of Government construction contract, Form No. 23, revised April 3, 1942. The detailed specifications, designated as Specifications No. 2867, provided that the work under the contract would proceed in accordance with two schedules. Schedule No. 1 covered the construction of the foundations and the erection of the steel towers, and Schedule No. 2 covered the stringing of the conductors and the overhead ground wires. The contract and specifications are in evidence as plaintiffs’ exhibit 1 and are incorporated herein by reference.
4. In accordance with paragraph 25 of the specifications, the Government purchased and furnished all of the structural steel for the towers, including the leg extensions and stub angles.
5. After plaintiffs had commenced work on the contract, a storm of unusual severity occurred along the entire length of the Central Valley of California, resulting in unusually heavy rainfall in the headwater areas in all of the streams having their sources in the Sierra Nevada Mountains. On *103 November 19, November 21, and again on December 4,1950, the American River overflowed its banks and caused a serious flood in the area where the construction work was in progress. The flood stream carried vast quantities of debris and caused considerable damage to the contract work. Excavations for footings were filled with silt, and the backfill around other footings was washed out. Stub angles were bent and steel members were bent or lost.
6. On December 11, 1950, plaintiffs wrote defendant, reporting the damage that had been done by the flood and requesting an extension of time within which to complete the performance of the contract. In the letter, plaintiffs also stated they were entitled to “adjustment and relief” under the contract, because of the unusual and unforeseen conditions created by the flood. Shortly thereafter, plaintiffs sent defendant an undated letter in which they requested that defendant issue written instructions for plaintiffs to proceed with the cleaning-up work and the repair of the damaged material. The letter stated that plaintiffs expected to be paid additional compensation on account of the damage caused by the floods.
By letter of December 14, 1950, the defendant replied to both communications and stated that plaintiffs’ letter of December 11, 1950, would be considered as a request for an extension of time under Article 9 of the contract. The letter further directed plaintiffs to proceed as soon as possible with the completion of the work under the contract and stated that if plaintiffs objected to the order, they could file a written protest within 20 days in accordance with paragraph 12 of the specifications.
On January 2, 1951, plaintiffs filed with the defendant a written protest on the ground that they had been ordered to proceed with the work without the issuance of a change order or the allowance of any compensation on account of the damage caused by the flood. In the letter of protest, plaintiffs gave an estimate of the probable amount of damage and stated that they were proceeding with the repair of the damaged work in the belief that they were entitled to additional compensation under the terms of the contract for the loss and damage caused by the floods.
*104 Defendant replied to the protest by letter of January 15, 1951, stating that plaintiffs’ letter would be considered as a claim for additional compensation and that upon completion of the contract and upon presentation of an itemized list of the losses sustained on account of the floods, findings of fact would be made on plaintiffs’ claim.
7. Notice to proceed with the work specified in Schedule No. 1 was received by the contractor on April 12, 1950, thus fixing January 7, 1951, as the final date for completion. In his findings of fact dated March 16, 1951, the contracting officer extended the time for completion 82 days because of the floods and 35 days because of certain changes in the specifications. By this action, May 4, 1951, was established as the final date for completion, and the work was finished on that date.
Notice to proceed with the work described in Schedule No. 2 was received by the contractor on April 24,1950, thus fixing the final date for completion as March 20, 1951. In his findings of fact of March 16, 1951, the contracting officer extended the time for 82 calendar days because of the conditions caused by the floods. Thus, the time for completion of the work in Schedule No. 2 was extended to June 10,1951, but the work was actually finished on May 15,1951.
8. In connection with the final payment voucher, plaintiffs executed a release but specifically excepted therefrom a claim for additional compensation in the sum of $39,739.63 on account of flood damages incurred “without any fault on the part of the contractor.”
9. By letter of June 25,1951, plaintiffs filed with the contracting officer a written claim in the sum of $39,739.63 for compensation claimed to be due under the contract and specifications for damages caused by the floods and incurred without fault on the part of the contractor.
In his findings of fact dated October 11, 1951, the contracting officer denied the claim on the ground that the provisions of Article 16 of the contract made the contractor responsible for all material and all work done until completion and acceptance thereof by defendant.
10. Within the time specified in Article 15 (the Disputes article), plaintiffs appealed to the Secretary of the Interior, *105 and on July 9, 1952, the findings of fact and the decision of the contracting officer were affirmed by the Solicitor of the Department of the Interior, who was acting pursuant to the authority delegated to him by the Secretary of the Interior.
11. The contract provided in pertinent part as follows:
Article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order. $ $ $ $ $
Article 10. Permits and responsibility for worle.— The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
‡ $ $ $ $
Article 16. Payments to contractors.—
❖ # ❖ % ❖
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
12. As stated in finding 4, paragraph 25 of the specifications provided that the Government would furnish the transmission line material and described the kinds, quantity, and location of such material. Paragraph 25 also provided as follows:
* * * * #
All materials in the approximate quantities listed in the above tabulations will be delivered to the contractor at the locations listed therein. The contractor shall haul all of the materials from the points of delivery to the work; shall provide suitable warehouses or other means of protection satisfactory to the contracting officer for *106 such of the materials as, in the opinion of the contracting officer, require storage or protection; and will be charged, as hereafter provided in this paragraph, for any material lost or damaged after delivery, except as otherwise specifically provided in these specifications. The cost of loading, hauling, storing, and caring for all of the materials furnished by the Government shall be included in the unit price bid for the work in which the materials are to be used. The cost of handling and installing minor miscellaneous items of metal, timber, and other work for which specific unit prices are not provided in the schedule, shall be included in the unit prices bid for the work to which they are appurtenant. The contractor shall return to the Government at the railway station most convenient to the work or at points convenient to the work, as directed by the contracting officer, all unused materials. The contractor will be charged for any materials lost or damaged after delivery or for any materials not used and not returned the same amounts that the materials cost the Government at the point of delivery to the contractor or amounts equal to replacement costs to the Government at the point of delivery to the contractor, whichever is higher; or if directed by the contracting officer during the progress of the work, the contractor shall replace, at his expense, such materials with equivalent grades of materials or articles as approved by the contracting officer, and shall deliver such materials to the site of the work as directed. The above amounts will include a reasonable charge for the Government’s warehousing and handling. The contractor shall return to the Government and load into cars at the railway stations designated by the contracting officer, all reels, complete with lagging, and will be charged for any reels not returned, or damaged to such an extent that they are not returnable, the same amounts that the Government is required to pay for such reels. If the lagging is not nailed to the reels, the lagging for each reel shall be tied securely to the reel.
‡ $ $ $ $
13. Under the general heading of “Steel Towers,” paragraph 58 of the specifications entitled “Handling and transportation of steel” provided as follows:
All galvanized tower steel shall be transported and handled with care to avoid bending or damage to the galvanizing. Pieces bent in handling may be used only if they can be straightened without injury to the galvan *107 izing. Material on which, galvanizing has been damaged shall be redipped unless in the opinion of the contracting officer the damage is local and can be repaired by soldering. Extensive soldering will not be permitted. Soldering shall be done with a soldering iron using 50/50 bar solder (tin and lead). Surplus flux or acids shall be promptly washed off, and the work shall be performed so as not to damage the adjacent coating or the metal itself. The repair of material damaged due to the operations of the contractor shall be made by and at the expense of the contractor. The contracting officer may order the contractor to repair material which is damaged due to no fault of the contractor and payment therefor will be made as extra work under the provisions of article 5 of the contract and paragraph 9 of these specifications. The Government will furnish the contractor shipping schedules for materials and will make every effort to correlate such shipping schedules with the construction requirements. All structural steel will be delivered to the contractor at the locations listed in paragraph 25. The contractor will be required to transport the steel from these storage yards to the tower sites.
14. In their appeal to the head of the department, plaintiffs relied particularly on the provisions of paragraph 58 of the specifications. With respect to plaintiffs’ contention, the decision of the Department of the Interior held as follows:
* $ # $ $
Paragraph 58 of the specifications deals with the handling and transportation of steel furnished by the Government. The authorit;/ of the contracting officer under this provision to order the contractors “to repair material which is damaged due to no fault” of the contractors and to make payment therefor as extra work is limited to repair work on the steel items directed by the contracting officer in the specified circumstance. This provision obviously cannot be stretched into a general promise by the Government to hold the contractors harmless for damages of whatever nature suffered by the contractors because of an unprecedented flood.
ij: ‡ :f: ‡
15. The claim of $39,789.68, which plaintiffs filed with the contracting officer, included a number of items. The largest of these was a claim in the sum of $21,150.60 for damages alleged to have been sustained by the partnership of Carrico *108 & Gautier, the subcontractor who was responsible for the erection of the steel towers. Only that claim is involved in this action.
On March 24, 1950, plaintiffs entered into a subcontract with the partnership of Carrico & Gautier. The subcontract referred to the principal contract and required the subcontractor to erect the steel towers as provided in the specifications of the principal contract. The subcontract contained the following pertinent provisions:
* $ * * *
Article IY. Liability of Subcontractor.
The Subcontractor shall hold and save the Contractor harmless from any liability for damage to the said work, or for injury or damage to persons or property occurring on or in connection therewith.
*****
Article X. Settlement of Controversies.
The Subcontractor agrees that if any controversy arises between Subcontractor or the Contractor and the Principal in respect to the amount, classifications, price, or value of the work performed or to be performed by the Subcontractor, or in respect to the condition, character, suitability, utility, price, or value of any material or supplies furnished or to be furnished by the Subcontractor, or in respect to any delay or delays in the prosecution or completion of the work caused by the Principal, or in respect to any other matter pertaining to or connected with the work provided for herein, the Contractor may, in its discretion, compromise and settle the same with the principal, and the tender to the Subcontractor of the amount due or to become due to him according to said compromise and settlement shall operate to release the Contractor and the Principal and their property and the structure or structures or other works covered by the original contract, and the whole thereof, from any and all liability to the Subcontractor for any amount in excess of the amount so tendered.
$ $ ‡ ‡ *
Article XIV. Claims for Extra Work or Damages.
The Contractor will pay for extra work performed and materials furnished by the Subcontractor, under written authorization by the Principal’s engineer, the actual cost thereof plus a percentage of said cost equal to one-half the percentage received by the Contractor, as *109 and wben it is paid therefor by the Principal. Any claim of the Subcontractor for extra work and/or materials not so authorized, or for damages of any nature whatsoever, shall be deemed waived by Subcontractor unless written notice thereof is given the Contractor within ten days after the date of its origin.
It is distinctly understood and agreed by Subcontractor that this agreement is made for the consideration herein named, and that the Subcontractor has, by examination, satisfied himself as to the nature and location of the work, the character, quantity and kind of materials to be encountered, the character, kind and quantity of equipment needed during the prosecution of the work, the location, conditions and other matters which can in any manner effect [sic] the work under this agreement. No verbal agreement with any agent either before or after the execution of this agreement shall affect or modify any of the terms or obligations herein contained and this contract shall be conclusively considered as containing and expressing all of the terms and conditions agreed upon by the parties hereto. No changes, amendments or modifications of such terms or conditions shall be valid or of any effect unless reduced to writing and signed by the parties hereto.
$ $ $ ‡ ‡
Article XIX. Final Payment.
Upon the completion of the original contract and payment therefor in full by the Principal, the Subcontractor will be paid the remaining amount due Subcontractor under this agreement. All prior partial payments shall be subject to correction in the final payment; Provided, that if, on completion of the said work by the Subcontractor and prior to the completion of the original contract as a whole, the Subcontractor shall demand and receive full payment for his work according to the computations of the Principal’s engineer, any changes thereafter made in said computations shall not inure in whole or in part to the benefit or loss of the Subcontractor. Final Payment as herein provided shall release the Contractor from any further obligation whatsoever in respect to this agreement. Subcontractor shall, as a condition precedent to payment, and before payment of said remaining percentage to him, execute and deliver to Contractor a full and valid release and complete discharge of and from any and all claims and demands whatsoever for all matters growing out of, or in any *110 manner connected with or founded upon, this contract or the work contemplated thereby.
The estimates and calculations made by the Principal, or its engineers, as to the amount of work done by the Subcontractor hereunder shall be final and binding upon the parties hereto and shall conclusively establish the amount of work done by the Subcontractor hereunder. It is understood and agreed that the Subcontractor shall receive no compensation for any work done by him which is not approved and accepted by the Principal and will make no claim against the Contractor for any compensation based on any estimates for calculations other than those made by the Principal, its engineers or other representatives; Pkovided, that if the Subcontractor, by direction of the Contractor, perforins any work or furnishes any supplies or materials not provided for in the original contract, he shall be paid therefor as provided herein.
In consideration of the promises, covenants and agreements of the Subcontractor herein contained and the full, faithful and prompt performance of this agreement and the plans and specifications constituting a part thereof, the Contractor agrees to pay to Subcontractor and Subcontractor agrees to receive and accept as full compensation for doing all work and furnishing all materials, supplies, etc., contemplated and embraced in this agreement, also for all loss or damage arising out of the nature of the work aforesaid, or from the action of the elements, or from any unforseen [sic] difficulties or obstructions which may arise or be encountered in the prosecution of the work until its acceptance by the Principal, and for all risks of every description connected with the work, also for all expenses incurred by or in consequence of the suspension or discontinuance of the work, and for well and faithfully completing the work and the whole thereof, in the manner and according to the terms of this agreement and the requirements of the Contractor and the instructions of the engineers in charge of said work, payment at the following unit prices:
‡ $ $ $ $
16. Following the damage caused by the flood and after defendant had directed plaintiffs to proceed with the work as stated in finding 6, plaintiffs sent Carrico & Gautier a written demand to comply with the order of the defendant. As has been stated, plaintiffs protested the order on behalf *111 of tbe subcontractor, but Carrico & Gautier proceeded with the replacement of the steel and repair of the damage to the steel towers and to the unassembled components thereof. At the conclusion of the work, the subcontractor submitted to plaintiffs the claim of $21,150.60 for the costs incurred in performing the repair work.
After the denial of the claim by the contracting officer and by the head of the department, plaintiffs filed this action for the use and benefit of Carrico & Gautier. Any sums recovered in this suit are to be paid to the subcontractor. The costs of the litigation have been and will be borne by the subcontractor.
17. After the subcontractor had completed the repair work, plaintiffs wrote the subcontractors as follows:
Please forward, at your earliest convenience, a detailed and itemized statement of any loss sustained by the floods as requested in our letter of January 17, 1951.
We will recognize any claims that the Bureau of Reclamation will allow, due to the flood conditions. However, the claim will be determined in the final analysis by the Bureau.
18. The subcontractor has not released plaintiffs from the claim involved here.
On August 19, 1954, plaintiffs and the subcontractor entered into a written stipulation, whereby plaintiffs agreed to waive the statute of limitations to and including September 1, 1956, with respect to the institution of any legal proceeding by the subcontractor against plaintiffs on account of the losses sustained as a result of the floods. The stipulation stated that it was entered into for the purpose of permitting plaintiffs to pursue the present action, until it is finally adjudicated, for the purpose of recovering damages on behalf of the subcontractor and without jeopardizing the rights of the subcontractor by the running of the statute of limitations. The stipulation also provided as follows:
$ H? $ $ $
It is further agreed by counsel for the parties hereto that this stipulation is in no way to be construed as an admission upon the part of Donovan-James Co. that it is liable to Carrico & Gautier as a result of the aforesaid flood damage.
*112 19. The repair of the steel towers and the unassembled components thereof that had been damaged by the floods was accomplished by Carrico & Gautier during the period beginning November 24, 1950, and ending May 4, 1951. At the same time the repair work was being done, the subcontractor was engaged in completing the construction of the steel towers as required in both the principal contract and the subcontract. Since the mechanics and laborers employed by the subcontractor were engaged at times on repair work and at other times on the work specified in the contract, the subcontractor’s foremen kept timebooks, which showed the number of hours each employee spent on repair work separately from the time he devoted to contract work. The time-books also showed the number of hours during which various pieces of equipment were used on repair work separately from the time such equipment was used on contract work. From the foremen’s timebooks, the subcontractor prepared weekly payroll sheets, showing the names of the workmen, the number of hours they devoted each day to repairing the damage, the rate of pay, and the total wages per week. The same records listed the pieces of equipment used on repair work each day and the number of hours of use.
When the claim of Carrico & Gautier was submitted to plaintiffs on June 6,1951, copies of the weekly payroll sheets covering the repair work were attached to the claim and were, in turn, forwarded by plaintiffs to the contracting officer. The summary sheet showed that Carrico & Gautier’s total costs for the repair work amounted to $17,479.84. The subcontractor also claimed 10 percent, or $1,747.98 for overhead and 10 percent additional, or $1,922.78 for profit.
After this action was instituted, one of defendant’s auditors examined the subcontractor’s books in an effort to verify the amounts set forth in the claim. At the time the audit was made, the foremen’s original time records were not available, but defendant’s auditor compared the weekly payroll sheets covering the repair work with plaintiffs’ payroll registers and canceled checks. From these records, he verified the fact that the workmen were paid in accordance with the weekly payroll sheets.
*113 20. On or about December 1,1950, the defendant’s engineer in charge of construction, in anticipation of a claim to be presented by plaintiffs, instructed the project engineer to keep records of the cost of labor, materials, and equipment used in the repairs required by the flood damage. Defendant had two field inspectors who daily traveled over the area in which both the repair work and regular contract work were being performed by Carrico & Gautier. The inspectors called at the foremen’s field offices each day for the purpose of obtaining information as to the labor and equipment used in the repair operations. On the basis of the inspector’s reports, the defendant’s project engineer prepared a tabulation showing that the subcontractor’s total costs on the repair work amounted to $12,037.13. To this, the sum of $1,203.71, or 10 percent, was added for overhead and profit, making a total cost of $13,240.84 as tabulated by the project engineer and submitted to the contracting officer.
As in the case of the timebooks of the subcontractor’s foremen, the original records made by the defendant’s field inspectors are no longer available.
21. Defendant contends that if it is held liable for the cost of the repair work, plaintiffs are not entitled to any allowance for overhead and profit. Aside from this, the only disputed items in the claim for repairs are the costs of direct labor, the amount expended for transporting the workmen to the site, and the expenses attributable to the equipment used in repairing the damage.
22. The greater weight of the evidence shows that the subcontractor expended the amounts claimed for direct labor and transportation in connection with the repair operations.
23. The subcontractor’s claim of $3,944.75 for equipment charges is based on the prevailing rental rates for similar equipment at the time the work was performed. These rates contain an allowance of profit to the lessor or owner of the equipment. The subcontractor did not rent any equipment from other concerns. The equipment, which consisted of several trucks, one trailer, and one pickup truck, was all owned by the subcontractor, and when the vehicles were sent to the project area, they were used partly on repair work and partly on regular contract work.
*114 In computing the equipment costs, the defendant used an hourly rate which took into account ownership expense, plus operating costs for each piece of equipment. The evidence establishes that the hourly rates used by the defendant would adequately compensate the subcontractor for all costs incurred in connection with the vehicles used on the repair work.
24. Exclusive of any allowance for overhead and profit, the total costs incurred by the subcontractor, Carrico & Gautier, by reason of the flood damage, were as follows:
Labor_$6,132.92
Insurance (20 percent of labor costs)_ 1, 226. 58
Travel expense- 921. 89
National Electrical Benefit Fund_ 61.35
Replacement steel_ 5,192.35
Equipment costs_ 1, 020.47
Total_ 14,555. 56
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.