**FOLK CONSTRUCTION COMPANY, INC.**

v.

**The UNITED STATES.**

No. 99–80C.

United States Claims Court.

June 14, 1983.

682

Jeffrey A. Davis, Houston, Tex., for plaintiff; James M. McGraw and Reynolds, Allen & Cook, Houston, Tex., of counsel.

Robert G. Giertz, Washington, D.C., for defendant; Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., of counsel.

## OPINION

WHITE, Senior Judge.

This action is being prosecuted by the plaintiff, Folk Construction Co., Inc. (Folk),

on behalf of Folk's subcontractor, Cross Construction Co. (Cross), in order to obtain an equitable adjustment for work performed under government contract No. DAXW01–78–C–0016 (the contract). The contract, which was awarded to Folk on October 31, 1977, at a total contract price of $1,023,849.50, was related to construction of the Lock-D Project, an important feature of the Tennessee-Tombigbee Waterway Project.

### Background Facts

The preliminary design of the lock provided that the spillway, abutment walls, and upper guide wall would be pile supported. The contract called for a test program to be conducted in order to obtain information for the final design of the project. The test program included a test excavation, test fill, dewatering studies, and a pile test study. Specifically, the pile test study was intended to determine the most appropriate pile type, allowable pile loads, and a basis for estimating pile lengths for contract bids. The pile test study would also develop information on hammer types for driven piles and installation procedures for cast-in-place piles.

Cross' subcontract provided that Cross would perform the portion of the contract which called for test pile driving and pile load testing. The contract required that seven pile load tests be conducted. Support piles, upon which a support frame would be placed, would be driven around each of the seven test piles.[1] The test piles were to be driven at a slightly greater depth than the support piles, so that a hydraulic jack could be placed between each test pile and the support frame. The test pile then would be jacked against test loads placed upon the support frame, and various measurements would be recorded by instruments attached to the test piles. A change in the contract required that two tests be conducted simultaneously.

Before driving the test piles and commencing the load testing, Cross was required to drive eight steel H piles at a batter (slant) for the purpose of enabling the contracting officer to determine which of three pile driving hammers listed in paragraph 7.1 of section 2E of the specifications would be used for driving the test piles. Paragraph 8.1 of section 2E of the specifications provided that the contracting officer would make the determination after extracting and inspecting the batter piles.

The contract did not specify the hammer to be used to drive or extract the support piles. Paragraph 8.2.2 of section 2E of the specifications provided merely that "[s]upplying temporary piles to support the load platform and the driving and extraction of these piles will be considered a subsidiary obligation of the Contractor * * *."

Cross drove the eight batter piles between February 8 and February 15, 1978. On February 15 and 17, 1978, Cross unsuccessfully attempted to extract the batter piles with an HD15BSP reciprocating air extractor that was on the job site. After failing to extract the piles with the air extractor, Cross ordered a vibratory hammer/extractor from the L.B. Foster Company. The L.B. Foster vibratory hammer/extractor utilizes vibrations both to drive and extract piles.

The vibratory hammer/extractor was not available immediately. The test piles, however, arrived on the job site on February 17, 1978. Although the batter piles had not been extracted and inspected, the contracting officer determined that the vertical test piles would be driven with a single acting air hammer. Consequently, the contracting officer ordered Cross to begin driving the vertical test piles.

On February 19, 1978, while waiting for delivery of the vibratory hammer/extractor, Cross drove two test piles with the air hammer. Cross also drove prestressed piles and 24-inch casing on February 20 and 21, and performed maintenance on its equip-

---

1. The test piles consisted of steel H piles, prestressed concrete piles, cast-in-place concrete piles, and drilled foundation caissons.

ment from February 22 to February 27, 1978.

The vibratory hammer/extractor arrived at the job site on February 27, 1978. Cross extracted four of the eight batter piles with the vibratory extractor on February 27 and March 1, 1978. On March 6, 1978, an official of the Corps of Engineers at the job site informed Cross that it could not use the vibratory hammer/extractor to extract the remaining four batter piles or to drive or extract any of the support or test piles, until the testing program in the test area was completed. At the same time, the official also instructed Cross that no work was to be done in the test area while the testing was in progress.

The Government's decision to prohibit use of the vibratory hammer/extractor was based in part on the L.B. Foster brochure, which stated that use of the hammer/extractor would have a compacting effect on certain types of soils within a limited area. Additionally, the Government concluded that the ban on use of the vibratory hammer/extractor and on the performance of any work in the test area during testing was necessary in order to prevent disturbance of sensitive instruments attached to the test piles.

The plaintiff contends that the Government's orders prohibiting work in the test area during testing and use of the vibratory hammer/extractor constituted changes in the contract which entitles Cross to an equitable adjustment for the increased costs incurred by Cross in complying with the Government's orders. Cross originally intended to use only the eight batter piles, after extracting them, and other piles on the site as support piles for each of the seven pile load tests. At the conclusion of each test, Cross planned to extract the support piles and redrive them around the next test pile, until each of the tests was completed. In this manner, Cross planned to work continuously—extracting and redriving support piles while another test was being conducted—during the testing.

The Government's orders prohibiting work in the test area during testing, and prohibiting use of the vibratory hammer/extractor, compelled Cross to abandon its original plan and adopt a more costly alternative method of performance. Cross purchased additional piles for use as support piles and drove all of them around the test piles between March 19 and March 24, 1978, before commencing any of the load tests. The various tests were conducted between April 4 and May 13, 1978.

On April 7, 1978, the plaintiff submitted a claim, on behalf of Cross, for an equitable adjustment in the amount of $37,000 for the purchase of additional piles which Cross used as support piles. On July 31, 1978, the plaintiff submitted, on behalf of Cross, an amended claim in the amount of $67,489. The amended claim was for the cost of the extra support piles and also for additional costs which, Cross alleges, resulted from idling his laborers and equipment during the test loads.

On March 9, 1979, the contracting officer denied the amended claim, except in the amount of $5,834.26, which the Government granted Cross as an equitable adjustment for the four batter piles which Cross was not permitted to extract.

On March 4, 1980, Cross filed a "direct access" complaint (then denominated a petition) in this court's predecessor, the United States Court of Claims, pursuant to section 10(a)(1) of the Contract Disputes Act of 1978 (41 U.S.C. § 609(a)(1) (Supp. V 1981)). Later, an amended complaint, which substituted Folk as the party plaintiff, was filed.

The case was tried in Houston, Texas, on June 29 and 30, 1982.

### The Severin Doctrine

While the original complaint, which named Cross as the party plaintiff, was still pending, the defendant filed a motion to dismiss the complaint on the ground that Cross lacked privity of contract with the Government. Then, as previously stated, an amended complaint, which substituted Folk as the party plaintiff, was filed on May 23, 1980. Even after the complaint was so amended, the defendant contended

that the plaintiff's claim was barred by the so-called *Severin* doctrine. However, the defendant's motion to dismiss, based on this ground, was denied by the Court of Claims in an order dated September 19, 1980. The defendant, in the proceedings on the merits, has renewed its argument based on the *Severin* doctrine. Consequently, it is necessary to decide at the outset whether the plaintiff may maintain this action.

In *Severin v. United States,* 99 Ct.Cl. 435 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), the Court of Claims held that a contractor could recover on behalf of its subcontractor only if the contractor has suffered actual damages (99 Ct.Cl. at 443). It is not sufficient for the contractor to prove merely that its subcontractor has incurred additional costs. The requisite injury is established "only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future." *J.L. Simmons Co. v. United States,* 158 Ct.Cl. 393, 397, 304 F.2d 886, 888 (1962).

The *Severin* doctrine was troublesome to the Court of Claims because of the harsh results which the doctrine sometimes produced when applied. As a consequence, the court placed limitations on the doctrine. This is illustrated by the decisions mentioned in the next paragraph.

The burden of establishing that the prime contractor has no liability to its subcontractor for the latter's damages is on the Government. *John McShain, Inc. v. United States,* 188 Ct.Cl. 830, 832–33, 412 F.2d 1281, 1283 (1969); *Morrison-Knudsen Co. v. United States,* 184 Ct.Cl. 661, 703, 397 F.2d 826, 852 (1968); *Southern Construction Co. v. United States,* 176 Ct.Cl. 1339, 1351, 364 F.2d 439, 447 (1966). A prime contractor is precluded from maintaining a suit on behalf of its subcontractor only when a contract clause or release completely exonerates the prime contractor from liability to its subcontractor. *J.L. Simmons Co. v. United States, supra,* 158 Ct.Cl. at 397–98, 304 F.2d at 888–89. The subcontract or release must expressly negate any liability

of the prime contractor to the subcontractor. *Donovan Construction Co. v. United States,* 138 Ct.Cl. 97, 99, 149 F.Supp. 898, 900, *cert. denied,* 355 U.S. 826, 78 S.Ct. 34, 2 L.Ed.2d 39 (1957). Moreover, the prime contractor may maintain an action even if its liability to the subcontractor is extinguished merely by prosecuting the subcontractor's claims against the Government or paying over to the subcontractor any recovery obtained from the Government. *Umpqua River Navigation Co. v. Crescent City Harbor District,* 618 F.2d 588, 594 (9th Cir.1980); *Keydata Corp. v. United States,* 205 Ct.Cl. 467, 477–79, 504 F.2d 1115, 1120– 21 (1974); *Owens-Corning Fiberglas Corp. v. United States,* 190 Ct.Cl. 211, 241–42, 419 F.2d 439, 457 (1969); *J.L. Simmons Co. v. United States, supra,* 158 Ct.Cl. at 398, 304 F.2d at 889; *Barnard-Curtiss Co. v. United States,* 157 Ct.Cl. 103, 111–12, 301 F.2d 909, 913 (1962).

The defendant contends that a settlement agreement executed by Cross, Folk, and Folk's surety, Aetna Casualty and Surety Company, completely released Folk of any liability to Cross for the alleged damages that are the subject of the present action. The settlement agreement arose out of a district court action in Mississippi, in which Cross filed a counterclaim against Folk for, *inter alia,* the $67,489 in alleged damages which Folk, acting on behalf of Cross, now seeks to recover from the Government. The agreement provided in pertinent part as follows:

(5) Folk consents to Cross pursuing its claim against the Corps in Folk's name as general contractor under the above described contract in the Court of Claims * * * and Cross hereby absolutely, fully and finally releases Folk and Aetna of any and all claims for damages asserted in its counterclaim in Cause No. EC79– 18–S–P pending in the Northern District of Mississippi (except to the extent such claims are not released herein) * * *.

As a part of the settlement agreement, Folk also assigned to Cross all of Folk's rights against the Government arising un-

der the subcontract between Folk and Cross. After Cross filed its action in the Court of Claims, however, the defendant challenged the assignment as void under the Assignment of Claims Act of 1940 (31 U.S.C. § 203 (1976)); and, as stated earlier in the opinion, the original complaint was amended by naming Folk as party plaintiff.

The settlement agreement executed by Cross and Folk is not the complete exoneration (*J.L. Simmons Co. v. United States, supra,* 158 Ct.Cl. at 397, 304 F.2d at 888) that the *Severin* doctrine requires.[2] The agreement imposed certain obligations on Folk for the purpose of assisting Cross in pursuing the claim against the Government in the Court of Claims. Specifically, the agreement provided that Cross would file the action "with the consent and cooperation of Folk" and that Folk and Cross would "cooperate in prosecuting Cross' claim." Folk also agreed to "forward all notices, pleadings, or other documents directed to Folk as a result of the filing of the proposed suit in the United States Court of Claims by Cross in the name of Folk." Moreover, the agreement clearly contemplated that Cross would be entitled to any recovery from the Government.

Thus, the release is not complete and unconditional. Folk's continuing obligation to cooperate in the prosecution of Cross' suit is an integral part of the release. The agreement is similar to those in which a prime contractor is obligated to prosecute its subcontractor's claims and to pay over to the subcontractor any recovery obtained from the Government. In such a situation, as previously stated, it is well settled that *Severin* does not apply. The same conclusion is warranted in this case. The mere fact that the settlement agreement also purported to assign Folk's claims against the Government to Cross does not mandate application of the *Severin* doctrine.

*The Plaintiff's Claim for an Equitable Adjustment*

The evidence adduced at trial establishes that one reason why the Government prohibited work in the test area during testing, including the use of the vibratory hammer/extractor, was to prevent disturbance of the sensitive instruments attached to the test piles. Supervisory officials of the Corps of Engineers testified that they concluded that movement and vibrations caused by nearby equipment would have affected the readings on the instruments.

The supervisory officials also testified that they prohibited the use of the vibratory hammer/extractor because they concluded that its use would have an undesirable compacting effect on the soils surrounding the test piles. The piles depended on "skin friction" against the foundation materials for their resistance, and the officials concluded that this would be affected by a compacting of the soil. The Government relied on the manufacturer's brochure, which indicated that the vibratory hammer/extractor could achieve a compacting effect on areas up to 10 feet square in sandy soils.

The defendant relies principally on the following provisions in the contract specifications:

## SECTION 1A
## SPECIAL PROVISIONS

\*     \*     \*     \*     \*     \*

SP–13. PROTECTION OF MATERIAL AND WORK: The contractor shall at all times protect and preserve all materials, supplies and equipment of every description (including property which may be Government-furnished or owned) and all work performed. All reasonable requests of the Contracting Officer to inclose or specially protect such property shall be complied with. If, as determined by the Contracting Officer, material, equipment, supplies and work performed are not ade-

---

**2.** In its previous motion to dismiss plaintiff's original complaint, based in part on the *Severin* doctrine, the defendant relied merely on the allegations contained in the complaint. The Court of Claims, in its order of September 19,

1980, held that the defendant had not met its burden of proving that the release, or some contract clause, completely immunized Folk from all liability to Cross.

quately protected by the contractor such property may be protected by the Government and the cost thereof may be charged to the contractor or deducted from any payments due to him.

\* \* \* \* \* \*

### SECTION 2E
### STEEL H–PILES

\* \* \* \* \* \*

1. SCOPE: \* \* \* After the piles have been delivered, the Contractor will be responsible for protection and installation of the piles. The Contractor will be responsible for any damage sustained by the instruments during delivery, handling or installation of the piles.

\* \* \* \* \* \*

8.2.3 *Measurements:* \* \* \* Provisions shall be made by the Contractor to protect the instrumentation, measuring system, and reference system from adverse temperature variations and from disturbance.

The plaintiff contends that the provisions just quoted establish only a "general, vague" duty on the part of the contractor to protect the Government's equipment and supplies from damage or vandalism. The plaintiff further argues that it could not reasonably have expected, on the basis of the quoted provisions, that the Government would prohibit it from using the vibratory hammer/extractor or from working in the test area during testing.

It is concluded that the contract provisions previously quoted were ambiguous. The quoted provisions did not explicitly or by clear implication prohibit Cross' plan to work continuously during the testing. There was no specified sequence for driving and extracting the support piles. Also, the quoted provisions did not specifically or by clear implication require or prohibit the use of any particular tool for driving or extracting support piles.

As the Court of Claims once said, "[a] government contractor cannot properly be required to exercise clairvoyance in determining its contractual responsibilities." *Corbetta Construction Co. v. United States,*

198 Ct.Cl. 712, 723, 461 F.2d 1330, 1336 (1972); *see also Blount Brothers Construction Co. v. United States,* 171 Ct.Cl. 478, 496–97, 346 F.2d 962, 973 (1965). Under the Government's interpretation of the present contract, Cross was required to exercise such clairvoyance.

The Government could have provided, very simply and plainly, in the specifications that no work was to be performed in the test area during testing. In this connection, evidence in the record shows that it is not uncommon to specify in a government contract that no work can be performed in a certain area. Also, in the specifications, the Government could explicitly have prohibited the use of a vibratory hammer/extractor, as actually was done in the subsequent contract for the construction of the Lock-D project.

It was reasonable, therefore, for the plaintiff to conclude that its original plan for performing the work was permissible under the contract. Also, it is clear that the plaintiff relied on its construction of the contract.

The defendant also contends that the plaintiff's plan was unreasonable because, according to the defendant, the plan conflicted with the following provision in section 2E of the contract specifications:

9. REMOVAL OF DRIVEN PILES: At the conclusion of all pile driving and pile loading tests, all piling, including Government furnished piling shall become the property of the Contractor. \* \*

The defendant argues that this provision precluded the part of Cross' original plan which involved the reuse of the eight batter piles as support piles for the testing. The defendant's interpretation of the provision is not persuasive. The quoted language did not govern the method of performing the contract work. After the batter piles were driven and the Government determined which hammer would be used for the tests, the Government had no further use for the batter piles. In fact, Cross extracted four of the batter piles and reused them as sup-

port piles, without any objection from the Government. Moreover, the Government allowed Cross an equitable adjustment for the four batter piles that he was not permitted to extract with the vibratory hammer/extractor, apparently in recognition of the fact that Cross had planned to reuse the piles as support piles.

■■■ Under the rule of *contra proferentem*, "[w]here the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted." *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418 (1947). Although the contractor must inquire about patent ambiguities and obvious omissions, "[t]he Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of failure to carry that responsibility." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). *Contra proferentem* "puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms; and it saves contractors from hidden traps not of their own making." *Sturm v. United States*, 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970).

■■■ The present case requires application of the rule of *contra proferentem*. The plaintiff reasonably relied on its construction of the contract. The Government was the drafter of the contract; and, as a consequence, the ambiguities in the document must be strictly construed against the Government.

The plaintiff is entitled to recover.

### Amount of Equitable Adjustment

■■■ The parties tried the issue of quantum as well as the issue of liability. The plaintiff claims that it is entitled to an equitable adjustment in the amount of $60,-829.89.[3] At the trial, Cross' principal officer testified about each of the specific items which, according to Cross, reflect increased costs resulting from the changes ordered by the Government. Cross produced its books and records at the trial for the purpose of establishing the additional costs allegedly incurred.

Cross' books and records were not available to the defendant until immediately before the commencement of the trial. Consequently, the defendant was unable to complete an audit prior to trial. The court therefore ruled that the defendant would be afforded an adequate opportunity after trial to examine Cross' books and records. The defendant, however, declined the opportunity.

It is clear that the Government's order caused Cross to incur expenses above what it would have cost to perform the contract in accordance with Cross' original plan. The plaintiff has submitted detailed proposed findings of fact on quantum, which the defendant has not specifically challenged. The Government has not submitted separate findings of fact on quantum. Consequently, after carefully considering all the evidence, the court concludes that Cross' proposed findings of fact constitute a reasonably accurate approximation of the increased costs incurred as a result of the changes directed by the Government, and that the proposed findings, with one modification, should be adopted.

In order to drive all of the support piles prior to commencing the pile load tests, Cross was required to purchase 24 additional steel piles from the L.B. Foster Company, at a total cost of $24,752.94. Because the cost of the additional piles cannot be correlated precisely to the checks and invoices, it was necessary to determine the total cost of the piles on the basis of unit cost. The sum

---

**3.** At the trial, Cross deleted from its claim cost items totaling $4,887.21: *i.e.,* $3,340.80 claimed for 6 days' rental on the vibratory hammer/extractor, $1,044 claimed for fuel, oil, and grease, and $502.41 claimed for a bond premium.

of $24,752.94 is established by multiplying 65 feet (the necessary length of the support piles) times 73 pounds (the weight per foot of the piles) times 24 pieces, dividing by 100, multiplying the quotient by $20.05 (the unit weight per hundredweight of the piles), and adding the cost of splicing the piles.

At the conclusion of the pile testing, the Government ordered Cross to extract and remove all of the piles from the job site. The order constituted a change in the contract specifications. Consequently, Cross is entitled to the cost of hauling the support piles away from the site. Cross determined the freight cost to be $3,940.24 on the basis of the carrier's rate of $3.56 per hundredweight.

The Government's order prohibiting Cross' original plan for performing the work caused Cross to incur delay costs which are compensable under the "changes" clause of the contract. Cross was required to idle its equipment and labor for 12 days because it was not permitted to work in the test area during testing. The figure of 12 days was established by the daily reports, which indicate the days that Cross was required to stand by during testing. As a result, Cross incurred 12 days of additional rental on a Manitowoc 3900 crane, at a total cost of $3,000. The amount of $3,000 is based on a $5,000 per month rental price and use of the crane for 8 hours a day, 5 days a week, at a cost of $250 per day.

The 12 days' delay also caused an additional cost of $604.80 for rental mats used to keep the crane from sinking into the mud in the test pit. Cross had 12 mats on the site, at a cost of $4.20 per day for each mat.

Cross incurred a cost of $10 per day, totaling $120, for rental of a 200-amp welding machine for 12 additional days.

Cross incurred additional labor costs in the amount of $7,257.01 for the 12 days' delay. The laborers were idle during the period when Cross was unable to work in the test pit. Cross employed two pile drivers, two laborers, and a crane operator on the site. The labor costs were computed on the basis of the applicable rate and hours for a standard work week.

Because of the Government's changes, 6 additional days were required to drive the additional 24 additional support piles, which Cross estimated could be driven at a rate of four per day. As a result, Cross incurred a cost of $1,788 for an additional 6 days' rental on an MRBS 500 pile driver hammer. Cross also incurred a cost of $600 for 6 days of additional rental of a 1600 CFM compressor.

The Government's changes caused the company to incur additional indirect costs attributable to the Repairs and Supplies account in the amount of $3,308.51. Cross based this figure on the company's 20-year average of 35 percent for the Repairs and Supplies account.

Cross' claim also includes a charge of $1,543.25 for the Mississippi sales tax on materials and equipment, and an additional gross receipts tax of 2½ percent, or $1,483.65.

Cross presented testimony that it incurred estimated indirect overhead costs in the amount of $7,037.10 as a result of the Government's changes. This figure is based on an estimate of 15 percent for overhead. The Mobile District of the Corps of Engineers audited the company's books in 1978 in connection with a modification to the contract, and the government auditor concluded that Cross' actual overhead was 16 percent.

Cross is entitled to profit as a part of the equitable adjustment. Cross has requested a profit of 10 percent, or $5,395.11, which in the present case is determined to be reasonable.

It should be noted that, pursuant to Modification No. 18 of the contract, the contracting officer granted Cross an equitable adjustment in the amount of $5,834.26 for the cost of the four batter piles that the Government prevented Cross from extracting. The plaintiff's present claim for the cost of the additional 24 piles does not reflect the equitable adjustment that was allowed Cross for the four batter piles. Con-

sequently, it is necessary to subtract $5,834.26 from the plaintiff's total request of $60,829.89, leaving $54,995.63 as the amount due the plaintiff.

## CONCLUSION OF LAW

Upon the foregoing opinion and the facts as found by the court and stated in the opinion, the court concludes as a matter of law that the plaintiff is entitled to recover.

Judgment will therefore be entered for the plaintiff in the amount of $54,995.63, plus interest computed in accordance with section 12 of the Contract Disputes Act of 1978 (41 U.S.C. § 611 (Supp. V 1981)).[4]

IT IS SO ORDERED.

4. Interest accrues from March 1, 1979. *Brookfield Construction Co. v. United States,* 661 F.2d 159, 168 (Ct.Cl.1981).