**KEYDATA CORPORATION**

v.

**The UNITED STATES.**

No. 299–72.

United States Court of Claims.
Oct. 23, 1974.

Harold Baer, Jr., New York City, attorney of record for plaintiff. Howard B. Weinreich, New York City, and Guggenheimer & Untermyer, New York City, of counsel.

John E. Lindskold, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before DAVIS, NICHOLS, and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

In 1968, Keydata Corporation[1] and the National Aeronautics and Space Administration (NASA) were both leasing space at 575 Technology Square, Cambridge, Massachusetts, an office building owned by the Wyman Street Trust. Early in that year NASA decided to expand its footage in the structure, and at the same time Keydata was seeking to move to larger quarters in another location. After negotiations in which NASA was represented by the General Services Administration (GSA), an agreement was reached as to NASA's

---

1. Formerly known as Charles W. Adams Associates, Inc., and also as Keydata and Adams Associates, Inc., but referred to as "Keydata" for convenience.

rental of Keydata's 2,093 square foot computer room on the first floor (and also other rental space, not now involved). The agreement was embodied in two lease amendments, one between Keydata and Wyman, the other between the Government and Wyman.[2] These modifications provided that Keydata would surrender possession of the computer room, and the Government would lease it (from Wyman), either on October 1, 1968 or on a date mutually agreeable to Keydata and the Government (with advance notice to Wyman) between August 1, 1968 and January 1, 1969.

The amendments also provided separately for the sale of certain fixtures. The Government promised to pay Wyman $39,000 for air conditioning equipment which Keydata had installed in the computer room, and Wyman obliged itself in the same amount in payment to Keydata.[3] These improvements had been installed by Keydata with Wyman's consent, and the tenant retained the right to remove the equipment so long as the premises were returned to their original condition.

The two lease amendments summarized above were executed on March 11, 1968. Keydata and the Government later selected the January 1, 1969 move-in date, by using the mechanism set up in the lease-cum-amendments. There were subsequent exchanges between the parties concerning the move-in date; what was said is a matter of dispute, but it is not now necessary to examine that history.[4] In any event, both parties agree that Keydata had not vacated by January 1, 1969, and that on the next day GSA sent Keydata a letter informing it "that the Government hereby cancels the proposed acquisition of 2093 square feet on the first floor at 575 Technology Square, as hitherto provided for under Amendment No. 7 to the above referred to lease. This action is necessary because of the fact that the space above referred to was not available for Government occupancy on January 1, 1969 * * *." The Government did not pay the $39,000 due under the agreements for the computer room improvements.

When the Wyman Street Trust refused to take action to collect this sum from the Government, Keydata brought suit against the Trust and its trustees in the Superior Court of the County of Suffolk, Massachusetts. Tried on the pleadings and a stipulation of facts, that action resulted in an order requiring the Wyman Street Trust to assign its rights to the $39,000 under the lease amendment to Keydata, and such an assignment was executed on April 21, 1971. Keydata sues here in place of Wyman and as its assignee.[5]

This suit involves two causes of action. The theory of the first is that Wyman fully performed its obligations as landlord under Massachusetts and federal law, therefore the Government's recission was illegal, and the United

2. One reason why this awkward form was used instead of a simple sublease was because Keydata's lease contained restrictive provisions which the Government thought undesirable.

3. The Government-Wyman agreement states in pertinent part: "Effective October 1, 1968 and upon receipt of an invoice from the Lessor the Government shall pay an additional lump sum payment of $39,000 for Tenant Improvements identified as follows:
Airconditioning equipment in computer rooms including electrical wiring and cables [footnote omitted].
Draperies in all areas.
The above Tenant Improvements shall become the property of the Government and otherwise subject to the provisions of Paragraph 8 of the basic lease."
The Wyman-Keydata amendment reads in part: "LESSOR agrees to pay LESSEE, upon receipt thereof from the Government, * * * the sum of $39,000.00 for a twenty-five (25) ton air conditioning unit with associated duct work, piping and electrical work, located in said 2,093 square feet on the first floor * * *."

4. See Part IV, infra.

5. Keydata was never in direct privity of contract with the Government in this transaction, nor has any such contention been made.

States now owes the $39,000. The second cause of action claims that in any case the conduct of the Government's agents constituted a waiver of any obligation on the part of Keydata to vacate by January 1, and that the defendant is estopped from so contending. Both parties have moved for summary judgment, the plaintiff as to its first claim only.

## I

Defendant asks for summary judgment on both claims, urging as one ground that Wyman's assignment of its rights to Keydata violated the Assignment of Claims Act, 31 U.S.C. § 203 (1970), and is therefore void.[6]

■ Despite the broad language of the Act, and the courts' tendency at an earlier time to read it as an all-inclusive prohibition, numerous classes of assignments, although literally within the statutory ambit, have been judicially exempted from its operation. The largest category of excised assignments are those which, in one form or another, occur by operation of law. Various such assignments which are regularly held to be unaffected by the Act include the passage of claims to heirs and devisees (Erwin v. United States, 97 U.S. 392, 397, 24 L.Ed. 1065 (1878)), transfers made incident to proceedings in bankruptcy or receivership (Segal v. Rochelle, 336 F.2d 298, 302 (C.A.5, 1964), aff'd 382 U.S. 375, 86 S.Ct. 511, 15 L. Ed.2d 428 (1966); Danielson v. United States, 416 F.2d 408, 410 (C.A.9, 1969); New Rawson Corp. v. United States, 55 F.Supp. 291, 293 (D.Mass.1943)), transfers by the succession of one business entity for another (Consumers Ice Co. v. United States, 475 F.2d 1161, 1163, 201 Ct.Cl. 116, 119 (1973)), assignments made by judicial sale or order (Price v. Forrest, 173 U.S. 410, 419–425, 19 S.Ct. 434, 43 L.Ed. 749 (1899); 36 Comp.Gen. 157, 158 (1956)), and assignments produced by operation of the law of subrogation (United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 376, 70 S.Ct. 207, 94 L.Ed. 171 (1949)). These classes of assignments are all thought to be outside the statute's scope because none of them threatens the dangers Congress sought to avoid by enacting the prohibition.

Within the past decade this court has once again explained the objectives of the Assignment of Claims Act:

The prohibitory language contained in the first paragraph of the statute above dates back in essentially its present form to 1853 (10 Stat. 170, Rev.Stat. § 3477 (1875)), and originally to an 1846 statute (9 Stat. 41). Over the years it has consistently been recognized by the courts to have two purposes—primarily, to prevent fraud; and secondarily, to avoid multiple litigation. More specifically, Congress is said to have had as its major objective the prohibiting of trafficking in claims against the Government such as by persons who would be in a position to exert political pressure or improper influence in prosecuting claims before the departments, the courts, or the legislature. [citations omitted] Secondarily, the courts have ascribed to Congress the motive of enabling the United States to deal exclusively with the original claimant instead of with several parties, thus obviating the necessity of having to inquire into the validity of specific transfers or assignments of the claim, minimizing subjection to

6. The Assignment of Claims Act provides in relevant part:

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, except as hereinafter provided, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof, * * * *"

successive litigation upon the same claim, and eliminating the risk of double payment or multiple liability. [citations omitted] Patterson v. United States, 354 F.2d 327, 329, 173 Ct.Cl. 819, 822–823 (1965) (footnote omitted).

When an assignment, or class of assignments, has been found not to pose those risks, the Act has ordinarily been held inapplicable.

■ The first significant fact about the assignment of Wyman's claim against the Government to Keydata is, of course, that it was done under order of the Superior Court of Massachusetts, as a result of an adversary proceeding.[7] In that respect it is very close to the other classes set out above, which have been held not to transgress the Assignment of Claims Act. Like those exempted classes, recognition of the Wyman-Keydata assignment will not frustrate the Congressional objectives.

For one thing, the court-ordered assignment will not increase the number of parties with whom the Government must deal; as discussed more fully *infra,* Keydata, not Wyman, is basically, if not technically, the real party in interest; Wyman is involved as a conduit more than anything else. Also, the case presents no real risk of double liability because the court-ordered assignment fully empowers Keydata to "give releases or discharges" on behalf of Wyman for all or any part of the $39,000 claim. If Keydata should recover on its claim here, it would be a small matter to condition payment of the judgment on the execution of a release binding against Wyman; we have imposed this condition to prevent double recovery. *Cf.* Carchia v. United States, 485 F.2d 622, 637, 202 Ct.Cl. 723, 740 (1973).

The Government urges that, since the assignment was ordered as part of a suit instigated by Keydata "for the sole purpose of attempting to circumvent the provisions of the Assignment of Claims Act," the normal exemption granted to judicially-compelled transfers should not be extended. It is said that the exception should be applied only where the assignment is involuntary, and that the Keydata-Wyman litigation was not defended with sufficient vigor.

The case law does not bear out the first distinction. Among the transfers found not to invoke the Act are those by devise or inheritance, and assignments from a defunct business organization to its substantially identical successor (see *supra*). These categories have a considerable element of volition, perhaps even more than in the situation before us.

As for the second point, we might be persuaded to regard with suspicion some assignments ordered as the product of collusive or sham litigation, but this is not such a case. The Government gives us no good reason to suspect the Keydata-Wyman suit. The mere fact that both parties joined in a stipulation of facts is not enough, especially where the dispute centers on the legal rights arising from essentially uncontested events. The answer filed by Wyman to Keydata's complaint seems a *bona fide* adversary response in the context of Wyman's interest in the controversy.

In any event even if the state action were somehow vulnerable, its only effect was to transfer the right to bring the claim to the basic party in interest. It is clear from the wording of the lease amendments, and the fact of their contemporaneous execution, that Wyman was merely a conduit through which GSA paid Keydata for the leasehold improvements. The tenant asked Wyman's

---

7. The final decree of the Massachusetts court held in part:

"This cause came to be heard, and thereupon, upon consideration thereof, it is ORDERED, ADJUDGED and DECREED:

"1. That Respondents execute and deliver to the Petitioner an assignment of all right, title and interest of the Respondents in any claim against the United States of America for the sum of $39,000 arising out of the matters set forth in the Petition, such assignment to be in the form of Exhibit A attached hereto. * * *"

consent (as required by its lease) before adding the air conditioning equipment, and such consent was apparently given. A letter from Wyman to Keydata at the time it was vacating the computer room stated: "If you choose to remove [the air conditioning equipment with associated duct work, piping and electrical work] you are, of course, required to restore the premises to their original condition," thus implying that the tenant had a right to carry away this equipment. The improvements clearly belonged to Keydata, and it was natural that Keydata would be the one to be compensated if the Government, as successor tenant, were to enjoy their use.

As we have said, such a court-ordered assignment, transferring the cause of action from the nominal owner to the beneficial owner, does not go counter to the legislative objectives of the Assignment of Claims Act. A transfer of that kind to the most intimately concerned claimant is unlikely to pose an added danger (and here does not) of fraud in prosecution of the claim,[8] or of expanding the number of parties with whom the Government must deal, to its prejudice or consternation.

## II

The Government raises another, related objection to the competency of Keydata to bring this suit. It is argued that Wyman was not liable to Keydata for the $39,000 if the Government did not in fact pay it that sum, and that therefore Wyman (in whose shoes Keydata now stands) was not injured by the refusal to pay the money. The contention springs from the wording of this part of the Keydata-Wyman lease amendment:

LESSOR shall not be obligated to make * * * [payment of $39,000] unless and until LESSOR receives such sums from the Government, nor shall LESSOR be liable to LESSEE in any event whatsoever should the Government fail to deliver such sums to LESSOR.

Defendant analogizes the legal situation created by this provision to that in Severin v. United States, 99 Ct.Cl. 435 (1943) cert. denied, 322 U.S. 733, 64 S. Ct. 1045, 88 L.Ed. 1567 (1944), holding that a prime contractor cannot sue for damage suffered by its subcontractor, if the prime contractor is in no way liable or responsible to the subcontractor for its loss.

This court has already dealt specifically, in considering the *Severin* doctrine, with limiting provisions comparable to that in the Wyman-Keydata arrangement. In Donovan Construction Co. v. United States, 149 F.Supp. 898, 900, 138 Ct.Cl. 97, 99, cert. denied, 355 U.S. 826, 78 S.Ct. 34, 2 L.Ed.2d 39 (1957), the prime was liable to the sub for extra work caused by the Government "as and when it is paid therefor by the Principal [Government]." It was held that this did not remove the prime's obligation to proceed against the Government, administratively and by recourse to the courts, and *Severin* did not control (149 F.Supp. at 900, 138 Ct.Cl. at 100). The same ruling was made in Barnard-Curtiss Co. v. United States, 301 F.2d 909, 913, 157 Ct.Cl. 103, 111–112 (1962), where the subcontractor released the prime from all liability except as to a claim the latter was pursuing against the United States on behalf of the former; "[a]ny amount which [the prime] receives from the government with respect to [the sub's] claim is excepted from this release, and [the prime] agrees to forward such sums it may collect when received."

The holding was reconfirmed in J. L. Simmons Co. v. United States, 304 F.2d 886, 158 Ct.Cl. 393 (1962); there, the

---

8. There is, of course, no suggestion that Keydata has sought or is likely to exert improper influence on the handling of the claim, or that it could do so. The state court supervision of the assignment is warrant against that likelihood, as is Keydata's pre-existing substantial interest in the claim. This is obviously not the case of a speculator buying up a claim to see what he can collect on it.

release given by the subcontractor provided that the prime would pursue the sub's claim but that "[e]ither the disallowance of the [sub's] claim by the court or the payment of the [sub] by [the prime] of the amount, if any, that may be recovered on said claim * * * shall completely extinguish all further obligation of [the prime] to [the sub] under the subcontract * * *, and shall operate as a full and complete release of any and all liability of [the prime] to the [sub] arising out of the performance by the [sub] of its work under said subcontract" (304 F.2d at 888, 158 Ct.Cl. at 396).

The court stressed that (a) there was no express negation of the prime's liability or responsibility on the claim in question, (b) the clauses simply set forth the manner in which the prime's liability was to be extinguished, (c) the prime assumed the obligation of prosecuting the claim, and that duty would have to be fulfilled before the duty to reimburse the subcontractor for the damages allegedly caused by the Government could be extinguished, and (d) "[i]t is apparent, then, that plaintiff is presently subject to liability on these claims and will continue to be so until liability is extinguished in accord with the method agreed to by the parties" (304 F.2d at 890, 158 Ct.Cl. at 400). *See also*, Owens-Corning Fiberglas Corp. v. United States, 419 F.2d 439, 457, 190 Ct.Cl. 211, 241–242 (1969).

■ The arrangement in the present case falls into this same category. Wyman was not absolved of all responsibility or liability by its agreement with Keydata. As the *Donovan* opinion put it, there was an implied undertaking "to proceed against the Government" in administrative and judicial proceedings should defendant fail to pay without good cause.[9] 149 F.Supp. at 900, 138 Ct.Cl. at 99–100. Wyman would not be responsible if the defendant was absolved, or if collection could not be enforced,[10] but the *Donovan* opinion recognized that such conditional liability "as a practical matter is perhaps the best that a subcontractor could hope to obtain from the prime contractor." *Id.* 149 F.Supp. at 900, 138 Ct.Cl. at 99. It does not seem realistic to expect the prime contractor (or here, Wyman) to become an insurer of the defendant's performance for its subcontractor (here, lessee).

We conclude therefore that, taking plaintiff's pleadings and supporting documents at face value, our prior decisions show that Wyman has suffered enough of a legal injury to bring suit, and Keydata, its assignee, may do so in its stead.

### III

On the merits, there is one important legal issue which can now be resolved. Keydata's motion for summary judgment asserts that the Government had no legal right to rescind its lease agreement with Wyman, despite plaintiff's holding-over. The argument is that the lease amendment obligated Wyman to do no more than convey to the Government the right to take possession of the computer room, that Wyman did not explicitly promise to deliver actual possession, and that no such promise can be implied.

---

9. That might amount, if the parties agreed, simply to the prime's "lending its name" for the purposes of a court suit or presentation of a claim (and thus, of course, subjecting itself to a possible counterclaim).

The decree of the Massachusetts court in this instance states that "upon execution and delivery of such assignment the Respondents [the Wyman Trust] will have no *further* obligation whatsoever to the Petitioner [Keydata] under the lease referred to in said as-

signment, whether or not Petitioner obtains any relief or recovers any amount on any claim or claims so assigned" (emphasis added). This affirmatively implies that, prior to the assignment, the Wyman Trust did have an obligation to plaintiff, and it was only the assignment which ended the obligation.

10. We do not read the clause as freeing Wyman from attempting to collect from the Government once the latter's liability was established.

Keydata's description of the lack of obligation of a landlord to secure his tenant in possession (in the absence of an express undertaking) is an accurate reflection of the present Massachusetts law. But there is a clear split among the states between the "American" and "English" rules on the liability of a landlord when the demised premises are occupied by a third party at the commencement of the lease term. *See* 49 Am.Jur.2d, Landlord and Tenant § 217 (1970). Under the so-called "American" rule, the landlord merely covenants that possession will not be withheld by himself or by one having paramount title. *Ibid.* This is the current rule in Massachusetts. Snider v. Deban, 249 Mass. 59, 144 N.E. 69 (1924). It is sometimes justified on the ground that, since the lessor has conveyed the sole and exclusive right of possession to the new lessee, he cannot maintain an action for possession in his own name. Snider v. Deban, *supra*, 249 Mass. at 66, 144 N.E. at 72.

The other doctrine, called the "English" rule, requires that, when the lease is silent on the point, the landlord deliver actual possession of the premises at the beginning of the term. 49 Am.Jur. 2d, Landlord and Tenant § 217, at 235 (1970). The lessee's rights are based on breach of the lessor's implied covenant that he has a right to lease the premises, or of the implied undertaking that the lessor will deliver possession to the lessee. 2 R. Powell, Real Property (Rohan ed. 1966) § 225 [1]. If the lessee cannot take possession because of a holdover tenant, or some other obstructing third person, the landlord is in breach of his obligation.

This division in view compels us to face the problems of whether we are bound to follow the Massachusetts rule because the real property is located there—and, if not, what standard to apply. It will prove simpler to reverse these questions and first take up the issue of what rule to adopt if we are free to choose on the merits of the competing principles. In such an area of free choice, we "should take account of the best in modern decision and discussion" Padbloc Co. v. United States, 161 Ct.Cl. 369, 377 (1963); Groves v. United States, 202 Ct.Cl. 660, 674 (1973).

The American Law Institute's most recent formulation, accepting the "English" rule, seems to us to represent "the best in modern decision and discussion." The Institute's phrasing (Restatement of the Law, Second, Property, Landlord and Tenant, § 6.2, p. 137 (Tent.Draft No. 2, 1974) is this:

Except to the extent the parties to the lease validly agree otherwise, there is a breach of the landlord's obligations if a third person is improperly in possession of the leased property on the date the tenant is entitled to possession and the landlord does not act promptly to remove such person and does not in fact remove him within a reasonable period of time. For such breach, the tenant may

(1) terminate the lease * * *

The Restatement gives persuasive reasons in support of this choice (Restatement of the Law, Second, Property, Landlord and Tenant, § 6.2, Comment a, p. 139 (Tent.Draft No. 2, 1974):

(1) The landlord knows, or should know, the status of the possession of the leased property better than the tenant in the period prior to the date the tenant is entitled to possession.

(2) The landlord knows, or should know, better than the tenant whether a person in possession of the leased property prior to the date the tenant is entitled to possession is properly or improperly on the leased property.

(3) Prior to the date the tenant is entitled to possession of the leased property, the landlord is the only one of the two who can evict a person improperly in possession of the leased property.

(4) In the situation where the person in possession of the leased property is entitled to be there until the date the tenant is entitled to possession, the case of the possible holdover prior

tenant, the landlord is the only one of the two who had an opportunity to get some assurance that the prior tenant would not hold over.

(5) The tenant will have received less than he bargained for if he must go forward with the lease and bear the cost of legal proceedings to clear the way for his entry on the leased property.

This "English" rule conforms to the commonsense notion of what a lease is. The tenant is buying space—in a building or in the open—and not merely the right to bring a lawsuit to try to get the space. The "American" (or Massachusetts) rule, on the other hand, rests on an abstruse technicality—the separation of legal title (which remains in the landlord) from the right to possession (which is conveyed to the new tenant)— and represents an unfortunate example of mechanical jurisprudence, grinding out a result without any regard for the true interests or policies involved.

Plaintiff objects that adoption for federal leases of the rule requiring the landlord to deliver actual possession places a Massachusetts lessor in a dilemma—he must deliver possession but cannot evict a third party or holdover tenant after the lease term has begun. *See* Snider v. Deban, *supra*, 249 Mass. at 66, 144 N.E. at 72. As the ALI comment suggests this difficulty is not insuperable. First, a landlord is able to protect himself in the lease document by expressly limiting or disclaiming his obligation to deliver possession, or else by requiring security of a prior tenant in possession that he will not hold over. Second, the landlord may have a remedy in damages against a holdover tenant; such at least is the majority American rule. 49 Am.Jur.2d, Landlord and Tenant, § 1123, at 1074 (1970). Third, the landlord is still in a better position to appraise, anticipate and bear the risk of this loss than a prospective tenant not yet in pos-

session. The risk ought to be upon the owner, unless the prospective tenant expressly agrees to shoulder it.

■ Are we, however, free to elect the "English" rule as a uniform federal standard applicable to government leases in all domestic jurisdictions, including Massachusetts? The states have a considerable interest in the definition of the property interests within their borders, and some aspects of federal law do defer to that concern. *See, e. g.* Comm'r v. Stern, 357 U.S. 39, 44–45, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958); United States v. Certain Property, 344 F.2d 142 (C.A. 2, 1965). But though a lease may concern and convey a property interest, it is also very much a contract—and it is settled that the contracts of the Federal Government are normally governed, not by the particular law of the states where they are made or performed, but by a uniform federal law. Padbloc Co. v. United States, 161 Ct.Cl. 369, 377 (1963); United States v. Wegematic Corp., 360 F.2d 674, 676 (C.A.2, 1966); Groves v. United States, 202 Ct.Cl. 660, 674 (1973). Leases are not sufficiently different from other federal procurement contracts to call for a different policy across-the-board in the construction of their terms. At least in this case in which there is no question as to the content of the property interest transferred, but merely a delineation of one of the landlord's collateral obligations, there is no adequate reason to subordinate federal to state law.[11] It is true that in Security Life & Accident Ins. Co. v. United States, 357 F.2d 145, 148–149 (C.A.5, 1966), the court applied Alabama law to a federal lease, but it did so only after finding that, in that particular, Alabama law fully conformed to the "general rule" and "general contract law" which would normally apply against private citizens in the same cir-

---

11. Perhaps a distinction might be drawn as to the characterization of property interests, *i. e.*, what is part of the real estate

and what is personalty. That issue is not before us in this case.

cumstances; in effect the court applied the accepted, general rule, not a special or unusual state doctrine.

The Federal Government's need for a uniform rule is strong. It ought to know in advance what its rights are if the premises are not available on the due date. But there are many jurisdictions in which it is not yet firmly established whether the "American" or the "English" rule controls, and the Government would either have to litigate or take a substantial chance on its position. On the other hand, as we have already indicated, the interest of the state in the landlord's obligation if the premises are unavailable seems to us minor, and relatively unconnected with its concern with the definition of property interests within its jurisdiction.

We hold, therefore, that we are free to disregard the Massachusetts rule, and we do so—for the reasons we have given —in favor of the "English" rule as set forth in the Restatement, as the appropriate standard for government leases. Accordingly, we deny the plaintiff's motion for summary judgment, grant on this ground the defendant's motion as to the first cause of action, and dismiss that portion of the petition.

IV

 This does not mean that the case can be disposed of now. There is a clear dispute, requiring resolution at the level of the trial division, as to whether the Government acquiesced in plaintiff's delay in making the computer room available, or extended its time for moving out, so that the defendant is now estopped from saying that January 1st was the crucial date (this is plaintiff's second cause of action). The Government seeks summary judgment on this point also, but is obviously not entitled to it in view of the clear factual conflict. With respect to this claim, the defendant's motion is denied without prejudice and the case is remanded to the trial division to determine the facts.[12]

The result on the whole case is that the Government's motion for summary judgment is granted as to the first claim but only on the ground that under the controlling rule the landlord was normally required to make the premises available to the Government on January 1st, and is otherwise denied as to both claims. The plaintiff's motion for summary judgment on the first claim of the petition is denied and that claim is dismissed. The second claim is remanded to the trial division for further proceedings.

---

12. The remand also includes the point whether defendant acted to terminate the lease

without affording Wyman a reasonable period of time to remove Keydata.