**BIXBY RANCH COMPANY, a California Limited Partnership, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–348C.

United States Court of Federal Claims.

May 28, 1996.

Lawrence Teplin, Los Angeles, CA, for plaintiff.

Mitchell J. Matorin, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen and Deputy Director Sandra P. Spooner, for defendant. Lt. Col. Robert Blevins, USAF, Department of the Air Force, of counsel.

## OPINION

LYDON, Senior Judge:

This contract case is before the court on the parties' cross-motions for summary judgment. The issue presented is which party bears the risk of loss of funds that are held back and placed in escrow to cure certain title defects at the closing of a purchase of easements when the escrow agent embezzles those funds. For the reasons set forth below, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted.

## FACTS

The pertinent facts surrounding the transaction in question are essentially undisputed. On September 30, 1992 plaintiff, Bixby Ranch Company (Bixby), and defendant, acting through the Department of the Air Force (Air Force), entered into an "Agreement for Purchase and Sale of Restrictive Easements and Joint Escrow Instructions" (Agreement). Under the terms of the Agreement, the Air Force agreed to buy, and Bixby agreed to sell, certain restrictive easements governing the development of Bixby's property adjacent

to Vandenberg Air Force Base in Santa Barbara County, California.

The parties agreed on a $22.1 million purchase price and the Air Force deposited this amount into escrow with Trico Title Corporation (Trico), the escrow agent selected by defendant for the closing. Before closing, however, defendant discovered certain clouds on Bixby's title. The title report for Bixby's property revealed certain exceptions to title, one of which involved an 1898 judgment and a wild deed to the property (First Exception) and the other of which related to certain drill site easements in favor of Chevron Oil Company (Chevron) (Second Exception). In order to avoid a lapse in appropriations at the end of the fiscal year on September 30, 1992, the Air Force recommended "that the title exception issue be addressed by amending the Purchase Agreement so that the Air Force would agree to acquire the easement conditioned on removal by Bixby Ranch of the objectionable clouds on title."

Exhibit "Two" to the Agreement,[1] entitled "Certain Agreements Re Certain Title Exceptions," sets forth the arrangement between the parties for resolving the title defects. Exhibit "Two", provides in part:

*Exceptions 11 and 21 (1898 Judgment Re Murphy and Wild Deed):*

Seller will, by agreement or judgment, quiet title to the clouds on Seller's fee simple title to Parcels Thirteen and Fourteen as described in said Exceptions 11 and 21 and, until obtained, $50,000 of the Purchase Price will be deemed to have not yet then been earned by Seller and will be retained in an interest bearing holdback account by Escrow Holder. When the Department of Justice has determined that title to said Parcels Thirteen and Fourteen has been quieted with regard to the matters described in Exceptions 11 and 21 (whether by agreement or final judgment), the amount held back shall be deemed earned and shall promptly be released to Seller if Seller has theretofore received or is then entitled to receive the holdback amount described under Exceptions 66

through 69 below. If Seller has not theretofore received or is not then entitled to receive the Exceptions 66 through 69 holdback amount (or such portion thereof as has not been expended), then the $50,000 holdback amount under this paragraph shall be transfer[red] to the holdback established under Exceptions 66 th[r]ough 69 and shall be disbursed pursuant to the provisions of this Agreement applicable thereto.

\* \* \* \* \* \*

*Exceptions 66 through 69 (Drill Site Related Easements):*

Purchaser, with the cooperation of Seller, shall use reasonable efforts to obtain a subordination of these easements to the terms of the Grant of Easements prior to Close of Escrow, at no cost to Seller other than such portion of the Purchase Price, not to exceed $450,000, as Seller and Purchase shall jointly authorize to be expended for such purpose. If such subordination is not obtained prior to Close of Escrow, $450,000 of the Purchase Price will be deemed to have not yet then been earned by Seller and will be retained in an interest bearing holdback account by Escrow Holder, the interest thereon to accrue for the benefit of and to be payable to Seller. Thereafter, Purchaser will promptly bring and diligently prosecute a condemnation action to acquire such subordination. The amount to be deposited in court with the declaration of taking and the amount of any deficiency judgment or settlement shall be refunded to the Purchaser by the Escrow Holder prior to the date payment to the court or defendant in condemnation is due. Such amounts shall be payable by the Escrow Holder to the Purchaser from the holdback funds described in this paragraph, if and to the extent of the funds held back pursuant to this paragraph, together with any funds available from the holdback pursuant to Exception 11. The cost of prosecuting such action shall be paid by Purchaser. When there has been a final judgment in the condemnation ac-

---

1. At oral argument, the parties apparently agreed that Bixby, with input from defendant, drafted Exhibit "Two", and thus, the rule of *contra prof-* *erentem* would not seem applicable. In any event, neither party advanced this rule in support of its respective position.

tion and payment by the Purchaser of all amounts awarded, or when subordination has occurred by agreement, any remaining balance of the holdback amount under this paragraph shall be deemed earned and shall promptly be released to Seller if Seller has theretofore received or is then entitled to receive the holdback amount described under Exception 11 above. . . .

Thus, the parties agreed that to protect defendant's interest in receiving clear title, the Air Force would hold back from Bixby $500,000 of the purchase price (Holdback Amount) until the title defects had been cleared. The Air Force offered to place the Holdback Amount in a noninterest-bearing escrow account under the control of the Army Corps of Engineers pending satisfaction of the title exceptions. Bixby, however, insisted on an interest-bearing account. Accordingly, the parties agreed to deposit the Holdback Amount into escrow with Trico. On December 18, 1992, the parties entered into the First Amendment to the Agreement, which provided additional detail on the handling of the Holdback Amount. Section 3 of the First Amendment provides, at subsection 10(g):

(g) *Holdback Account.* (1) At closing, Escrow Holder [Trico] shall retain from the Purchase Price the sum of Five Hundred Thousand Dollars ($500,000) pursuant to the provisions of Exhibit "Two" hereto relating to (i) Exceptions 11 and 21 (as to which the initial holdback amount is $50,000), and (ii) Exceptions 66 through 69 (as to which the initial holdback amount is $450,000). Escrow Holder shall deposit those funds into an interest bearing account or book entry certificate of deposit at Wells Fargo Bank, N.A. (the "Holdback Account"). Funds in such account shall be withdrawable on not more than seven (7) days notice or, if a certificate of deposit shall have a term of not more than thirty (30) days. Escrow Holder shall select, from the accounts and book entry certificates of deposit offered by the bank at the date of the deposit, the one which then will earn interest at the highest rate for accounts or certificates of deposit meeting the foregoing availability/maturity requirements (provided, however, that Escrow

Holder shall select an interest bearing account instead of a certificate of deposit unless the certificate of deposit will bear interest at a rate that is one-half percent (0.05%) per annum higher than the best account rate then available).

(2) If a certificate of deposit is selected, it will be rolled over upon maturity into a certificate of deposit of the same term unless Seller directs Escrow Holder to choose a shorter maturity. Seller may select the type of account or term of the certificate of deposit at Wells Fargo Bank, N.A., from time to time provided that such account or certificate of deposit meets the availability/maturity requirements specified above.

(3) Interest on funds in the account will be paid over to Seller monthly and Seller shall be responsible for the payment of any taxes due with respect to such interest, as provided for in Subsection 10(d) hereof. Principal in the Holdback Account shall be payable in accordance with the applicable provisions of Exhibit "Two" hereto when the conditions for release thereof have been met. Purchaser and Seller shall furnish payout instructions to Escrow Holder promptly after such conditions have been met with respect to any payment of such funds provided for in Exhibit "Two" hereto.

Escrow closed with respect to the purchase of the easements from Bixby on December 24, 1992. On that date, Bixby delivered a recorded grant deed to the Air Force, and Trico released $21.6 million of the purchase price to Bixby. Accordingly, the parties agree that title to the easements passed to defendant at closing. The parties, however, disagree as to whether title to the entire purchase price passed to Bixby at closing. After escrow had closed with respect to the purchase of the easements, Trico closed the purchase price escrow account and deposited the Holdback Amount into a new interest-bearing escrow account at Wells Fargo Bank designated "Trico Title Company as Holder for Bixby Ranch Company." Originally, the Holdback Amount was to be held at First Interstate Bank, where the purchase price escrow account had been established, but

Bixby insisted on using Wells Fargo Bank.[2] Bixby received monthly payments of the accrued interest on the Holdback Amount in accordance with subsection 10(g)(3) of the Agreement as amended by the First Amendment.

Bixby successfully satisfied the First Exception by obtaining judgments in quiet title actions on or before January 1994. From the date of the closing of the purchase on December 24, 1992, through August 1994, the Air Force negotiated with Chevron on Bixby's behalf for the subordination of Chevron's rights to the easements the Air Force had purchased from Bixby. By August 22, 1994, the parties had agreed that Chevron would receive $150,000 in exchange for subordinating its rights to the easements. Although the Air Force did not finalize its agreement with Chevron until December 29, 1994, it authorized the release of the entire Holdback Amount except for the $150,000 to be paid to Chevron. On or about August 22, 1994, Bixby notified Trico that the Holdback Amount should be disbursed. Prior to August 22, 1994, however, the State of California placed Trico into conservatorship and the President of Trico, Mr. Devin Park, embezzled substantial sums from funds escrowed with Trico, including the Holdback Amount.[3] Mr. Park apparently withdrew the Holdback Amount and closed the escrow account at Wells Fargo on or about January 11, 1994. As a result of Mr. Park's embezzlement of the Holdback Amount, the Air Force had to use other funds to pay Chevron for the subordination of its rights to the easements the Air Force had purchased from Bixby.

On March 7, 1995, Bixby submitted a claim for $350,000 plus interest to the Contracting Officer (CO). The CO did not issue a decision on Bixby's claim within sixty days. However, on July 13, 1995, the CO issued a "final decision" ordering Bixby to pay $150,-000 to defendant. On May 16, 1995, plaintiff filed the instant complaint alleging breach of a written contract and demanding the payment of $350,000 plus interest. In response, defendant filed its answer and counterclaim asserting that plaintiff breached its contract with defendant and seeking $150,000 plus interest. Plaintiff, in its response to the counterclaim, raised two affirmative defenses: negligence and unclean hands.

## DISCUSSION

Summary judgment is properly granted when there are no material issues of fact, RCFC 56(c) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986), and the movant is entitled to judgment as a matter of law, RCFC 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When both parties have moved for summary judgment, the court must evaluate each party's motion on its own merits and draw all reasonable inferences against the moving party. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). A court is not compelled to decide a case on summary judgment simply because both parties have submitted summary judgment motions. However, if the record could not lead a rational trier of fact to find for the nonmoving party, there are no genuine issues, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Contracts that involve the federal government or its agencies are governed by federal law rather than by the law of the particular states in which the contracts are executed or performed. *Adolfo Zlotolow, et al., v. United States*, 35 Fed.Cl. 133, 136 (1996) (citing *Prudential Ins. Co. v. United*

---

2. Bixby had authority to do so pursuant to subsection 10(d) of the Agreement which provides:
 If Seller so requests, Escrow Holder shall deposit into an interest bearing account, with a financial institution satisfactory to Seller, funds to be held by Escrow Holder after closing. Seller shall be entitled to receive, and shall pay any taxes payable with respect to, any interest or other income earned thereon.

3. Mr. Park was prosecuted for mail fraud, theft of government property, and making a false statement to a financial institution. He pleaded guilty and received a sentence of 68 months in jail and $4 million in fines and restitution. On or about September 5, 1995, Mr. Park filed for bankruptcy under Chapter 7 of the Bankruptcy Code.

*States,* 801 F.2d 1295, 1298 (Fed.Cir.1986) *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987)); *Sun Cal, Inc. v. United States,* 25 Cl.Ct. 426, 428 (1992). This court, however, has not found any binding precedent directly addressing the issue raised here. Therefore, in resolving the issues raised in the parties' cross-motions, the court will "take account of the best in modern decision and discussion." *Keydata Corp. v. United States,* 205 Ct.Cl. 467, 482, 504 F.2d 1115, 1123–24 (1974).

## I

Generally, there are two types of escrow arrangements associated with realty sales. In what is referred to as a "deed and money" escrow, the buyer deposits the purchase price and the seller deposits the grant deed with an escrow holder. Escrow closes when the holder delivers out of escrow the deed and all monies deposited. The general rule for risk of loss of funds held in a typical deed and money escrow is as follows:

> If the property in the custody of the escrow holder is either embezzled or lost by it, then, as between the seller and the buyer, the loss falls on the one who owns the property at the time of the embezzlement or loss. For example, if the escrow holder embezzles the purchase price before the time when, under the terms of the escrow, the seller is entitled to it, the loss falls on the buyer, since it is still his money. On the other hand, if the money be embezzled after the time when the seller has become entitled to the money, the loss falls on him, since it is now considered his property.

*Pagan v. Spencer,* 104 Cal.App.2d 588, 232 P.2d 323 (1951) (quoting *Crum v. City of Los Angeles,* 110 Cal.App. 508, 294 P. 430, 432 (1930)). This general rule, which has been referred to as the "entitlement rule," is based on one or both of two theories: ownership and agency. Under the theory of ownership, the risk of loss of money in escrow usually falls on the buyer, because as depositor of the money, the buyer "retains legal title thereto" until the closing. Under a theory of agency, the escrow holder is deemed to have acted as an agent for the depositor-buyer in

holding the money and the buyer bears the risk of loss occasioned by the wrongdoing of the agent. *See generally* Robert L. Flores, *A Comparison of the Rules and Rationales for Allocating Risks Arising In Realty Sales Using Executory Sale Contracts and Escrows,* 59 Mo.L.Rev. 307 (1994).

Plaintiff asserts that the issue in this case is whether or not Bixby was unconditionally entitled to the Holdback Amount at the time of the embezzlement. Plaintiff contends that if Bixby was unconditionally entitled to the funds, then Bixby was in fact the owner and bears the risk of loss. If not, then defendant, as depositor of the funds, bears the risk of loss and is obligated to pay Bixby the balance of the purchase price. Plaintiff claims that Bixby was not entitled to the funds on the date of Mr. Park's embezzlement on January 11, 1994.

Plaintiff contends that the explicit language of the Agreement establishes that satisfaction of both the First and Second Exceptions was a condition precedent to its right to any of the funds held in escrow. Specifically, plaintiff notes that the Agreement provides that the Holdback Amount "will be deemed to have not yet then been earned" until Bixby quiets title to the easements. Furthermore, the Agreement provides that both exceptions must be satisfied before Bixby could receive any portion of the Holdback Amount. Because the express language of the Agreement establishes that Bixby could not demand the Holdback Amount until the exceptions to title were cleared, plaintiff argues that the funds remained in complete control of defendant and could be used up to the maximum amount to settle or resolve the Chevron easements, and thus, Bixby could ultimately be entitled to no sums whatsoever.

The test in this case, plaintiff contends, is whether it was entitled to demand the Holdback Amount and thus whether it unequivocally was the owner of the Holdback Amount until both the First and Second Exceptions were satisfied. Plaintiff argues that removing the clouds to title were conditions precedent to its entitlement to the Holdback Amount. Because both exceptions had not been satisfied before Mr. Park embezzled the Holdback Amount, plaintiff asserts that it

was not entitled to, and therefore did not bear the risk of, loss of the Holdback Amount. Plaintiff cites *Hildebrand v. Beck*, 196 Cal. 141, 236 P. 301 (1925) and *Pagan*, *supra*, as illustrative of this test and as support for the proposition that the general rule for risk of loss applies in this case.

Defendant responds that title to the easements passed to defendant at the closing on December 24, 1992, at which time title to the entire purchase price, including the Holdback Amount, passed to Bixby. Contrary to plaintiff's argument, defendant contends that release of the Holdback Amount was necessarily a condition subsequent to the passage of title of the Holdback Amount to Bixby. Although obtaining clear title to the exceptions was a condition precedent to Bixby's right to receive the Holdback Amount, it was a condition subsequent to the closing and thus was a condition subsequent to the passage of title of the Holdback Amount to Bixby.[4] Although the Agreement designates the Holdback Amount as "unearned", defendant argues that the Agreement as a whole firmly establishes that Bixby had title to the Holdback Amount. First, the Agreement includes the Holdback Amount as part of the total agreed upon purchase price.[5] Second, the Agreement gives Bixby the authority to approve or disapprove the sum to be paid to Chevron for the subordination of its rights to the easements purchased from Bixby.

## II

This case presents an exception to the typical escrow arrangement to which the general rule for the risk of loss applies. The money at issue in this case was embezzled from what is generally referred to as a "set-aside" escrow, or a "cure" or "repair" escrow. Set-aside escrows generally are used, as in the instant case, to salvage the closing of a sale that otherwise would be canceled due to the discovery of a cloud on title. The buyer and seller proceed with the sale of the property, the seller delivers the deed to the buyer, and the buyer delivers the bulk of the purchase price to the seller. The buyer places the remaining portion of the purchase price in escrow and releases that amount to the seller only after the cloud on title is removed. *Flores*, *supra*, at 322. In order to proceed with the closing in this case, the parties agreed that at closing defendant would place $500,000 of the purchase price in escrow until the clouds on Bixby's title were removed. Thus, *Hildebrand* and *Pagan* are inapposite to the facts of this case. Both cases involve the loss of funds held in typical deed and money escrows. In both cases, the buyer bore the risk of loss of the money in escrow because title to the property had not yet passed to the buyer and, consequently, title to the money in escrow had not yet passed to the seller.

Two recently reported cases, with facts similar in all material respects to the instant case, address allocation of risk of loss in set-aside escrows. In *GE Capital Mortgage Servs., Inc. v. Avent*, 114 N.C.App. 430, 442 S.E.2d 98 (1994), the buyers came to the closing prepared to fulfill all of their obli-

---

4. Section 4 of the Agreement, entitled "Conditions Precedent To Closing" provides:

> (a) The following shall be conditions precedent to Purchaser's obligation to consummate the purchase and sale transaction contemplated herein (the "Purchaser's Condition Precedent"):
>
> (1) Seller shall have delivered the Grant Deed ... and all other documents required herein of Seller to Escrow Holder and shall have performed each and every obligation required to be performed by seller under this Agreement, specifically including, but not limited to, all obligations required pursuant to Section 3 of this Agreement.
>
> (2) Recording has occurred (or at closing will occur) of such title curative documents as are required by the Purchaser pursuant to title opinion of the United States Department of Justice; *provided, however, that, as to matters described on Exhibit Two hereto, or any other title matter, with respect to which the Secretary of the Air Force can and has agreed to waive objection or to provide to the Department of Justice a certificate permitting closing to occur without cure, such waiver will be given or certificate provided in order to permit the closing to occur.* (emphasis added)

5. Section 2 of the Agreement provides:

> The purchase price for the Easements is Twenty–Two Million One Hundred Thousand Dollars ($22,100,000.00) (herein "Purchase Price"). The Purchase Price shall be paid to Seller at closing ... except as provided for on Exhibit "Two" hereto (which Exhibit is incorporated herein by this reference).

gations under their contract for the purchase of the seller's property. The seller, however, had not canceled an outstanding deed of trust on the property and therefore was unable to convey to the buyers the marketable title for which they had bargained. The parties proceeded with the closing and agreed to deposit a portion of the purchase price in escrow until the seller obtained a cancellation of the deed of trust. Subsequently, the escrow holder absconded with the funds and the seller brought suit. The court concluded that the seller was entitled to the funds held in escrow at the time of the embezzlement and therefore bore the risk of loss. In making this determination, the court looked to the purpose of the escrow, the party that held title to the funds, and the party whose conduct made it possible for the loss to occur. The court stated:

> Clearly, the purpose of the escrow was to insure that the funds were available to obtain cancellation of the Selheim deed of trust if [seller] failed to do so; or, if the Selheim deed of trust was otherwise released and cancelled by [seller], the funds were to be paid to [seller]. In either situation, the funds were held by [the escrow holder] for the benefit of [seller]; in no event were the funds to be returned to the [buyers]. Having obtained title to the property, the [buyers] no longer held title to the funds in escrow.

> \* \* \* \* \* \*

> Our holding is consistent with the equitable principle that "where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur, must bear the loss." ... [I]t was [seller] who gave [escrow holder] the opportunity to abscond with the escrow funds by failing to meet its contractual obligations, thereby necessitating the escrow agreement as a means of closing the transaction as scheduled.

*Id.* at 101. (citations omitted)

Likewise, in *Stuart v. Clarke*, 619 A.2d 1199 (D.C.App.1993), the seller failed to obtain a release of a deed of trust prior to closing. The parties agreed at closing to put a portion of the purchase price, i.e., the amount of the unreleased deed of trust, in escrow until the seller obtained its release, at which time the seller would be entitled to receive the amount held back. Subsequent to the closing but prior to the seller obtaining the release, the escrow holder absconded with the money. In concluding that the seller bore the risk of loss of the embezzled escrow funds, the court focused on the status of the title to the property and the title to the purchase price. The court distinguished the escrow account therein from other, more typical escrow situations, i.e., deed and money escrows, because the parties reached a settlement through which legal title to the property passed to the buyers. The court stated:

> [T]itle to the property has passed to the buyer, and thus the proceeds of sale—including the amount retained in escrow—have passed to the seller, subject to his performance of a condition subsequent entitling him to release of the escrowed funds. The buyers cannot logically be the owners of both the purchased property and the portion of the money in escrow.

*Id.* at 1200. The court noted that its decision was supported by the following equitable principle: "where one of two innocent parties must suffer a loss the loss should be borne by the one whose act permitted the loss to occur." The court reasoned that if the seller had been able to convey clear title at the time of the closing, there would have been no need for the escrow arrangement and thus no loss would have followed. *Id.* at 1201 n. 2.

Similarly, in *Cradock v. Cooper*, 123 So.2d 256 (Fla.Dist.Ct.App.1960), the court held that the seller bore the risk of loss because the purpose of the escrow was to clear title (removal of a tax lien) after title to the property had already passed to the buyer and because the buyer retained no control over escrowed funds. Unlike the courts in *GE Capital* and *Stuart*, the *Cradock* court did not distinguish between performance of a condition precedent and a condition subsequent. In *Cradock*, the agreement between the buyer and the seller provided that the money either would be paid to the seller if the seller cleared the lien, or would be used

by the escrow holder to clear the lien with any surplus to be paid to the seller. Because the agreement contained no provision for any of the money to return to the buyer, the court held that the general rule for risk of loss did not apply. The court stated that an exception to the general rule applies "where under the circumstances of the escrow agreement the [buyer] would not be entitled to the return of the subject matter under any circumstances, irrespective of performance of the terms of the agreement." *Id.* at 258.

Plaintiff attempts to distinguish these three cases by characterizing the clearing of title therein as simple "ministerial" acts involving payment of a fixed sum and no negotiation. Plaintiff's distinctions, however, are not valid. The nature of the cloud on title or the effort needed to clear title were not critical factors in *GE Capital, Stuart,* or *Cradock.* The dispositive factors in these cases were as follows: title had passed at closing; the funds in escrow were to be used to clear title with any leftover amount remaining with the seller; and the buyer under no circumstances would be entitled to the return of the funds in escrow. Moreover, plaintiff does not explain how the acts required to clear title in this case differ from the so-called ministerial acts in the cases cited above. There appears to be no significant difference. Bixby obtained clear title to the First Exception by bringing quiet title actions and, in essence, title to the Second Exception was cleared by the Air Force's paying a negotiated sum of money to Chevron, i.e., $150,000. Indeed, although the parties in *Cradock* deposited a fixed sum in escrow, the amount actually needed to clear the tax lien on the property was negotiated. *Cradock,* 123 So.2d at 257.

Plaintiff further argues that *GE Capital* and *Stuart* are not on point because therein "the seller was entitled to the funds upon occurrence of conditions subsequent, providing the lien releases, which thereafter entitled the escrow to release the escrow funds. In this case the seller is not entitled to the funds and they are deemed to be 'unearned' until a condition occurs that is a condition precedent to the receipt of the funds." Plaintiff's analysis fails to illustrate any sig-

nificant difference between the facts of *GE Capital* and *Stuart* and the facts of this case. Instead, plaintiff's analysis reinforces that these cases are directly on point. The seller herein, like the sellers in *GE Capital* and *Stuart,* was entitled to the funds held back when the clouds on title were removed.

Hence, the test applicable here is who had title to the funds in escrow, not whether there was a right to receive the funds upon demand at the time of loss. If, as plaintiff argues, risk of loss is borne by the party that has a present right to receive the Holdback Amount, no party would bear the risk of loss. Under the Agreement, neither party had a present right to receive the Holdback Amount. Applying the principles of *GE Capital, Stuart,* and *Cradock* to the facts of this case, the court finds that plaintiff must bear the risk of loss of the Holdback Amount. As noted above, the Agreement provides that the Holdback Amount was included in the purchase price and was to be used to clear title to the property. Also, because it is undisputed that title to the property passed to the buyer at closing title to the purchase price necessarily passed to the seller. *See Stuart,* 619 A.2d at 1201 ("It simply does not make sense to say the buyers had title to the escrowed funds while recognizing that the buyers also had title to the real property."). Finally, Bixby's failure to provide clear title to the easements caused the escrow arrangement to occur. Accordingly, the court concludes that Bixby, as owner of the Holdback Amount, bears the risk of loss occasioned by Mr. Park's embezzlement.

## III

Both parties have raised additional issues which, while not dispositive, merit some discussion. Plaintiff contends that defendant's actions demonstrate that defendant owned the Holdback Amount. First, defendant's prosecution of Mr. Park shows that defendant considered the funds to be its own because Mr. Park's conviction was based on defendant's ownership of the Holdback Amount. The government's Information in the prosecution of Mr. Park alleged that Mr. Park embezzled funds "belonging to the Department of the Air Force, an agency of the

United States." Moreover, in a letter dated September 23, 1994, Robert Colangelo, attorney for the Army Corps of Engineers, referred to the $500,000 in escrow as "federal funds" and encouraged prosecution of Mr. Park "for his apparent fraud and embezzlement against the United States Government with regard to this escrow account." Likewise, Brigadier General Bruce K. Scott, in a November 4, 1994 letter, referred to the $500,000 as "federal funds."

Defendant responds that the government's indictment of Mr. Park for theft of government property is irrelevant to the issue of which party had title to the Holdback Amount. Plaintiff, defendant asserts, confuses the question of title to the funds, which determines who bears the risk of loss, with the question of whether the government had a sufficient property interest in the Holdback Amount for it to qualify as government property under 18 U.S.C. § 641.[6]

■ Under section 641, the government need not have actual title to the property in question for it to qualify as government property for purposes of that statute. A manifestation of "supervision and control" will suffice. *See United States v. Bailey*, 734 F.2d 296, 300–01 (7th Cir.) *cert. denied*, 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984). Thus, the determination that the government had the requisite "supervision and control" over the embezzled funds to pursue an indictment of Mr. Park under section 641 is not inconsistent with the finding that Bixby bore the risk of loss of the same funds. The government's "supervision and control" of the Holdback Amount is manifested in the Agreement which provided that Trico could not disburse any funds to Bixby without the Air Force's authorization. Although the government did not own the embezzled funds, it certainly had a financial interest in them. A portion of these funds ($150,000) was to be used to subordinate Chevron's easement rights. As a result of the embezzlement, the government had to pay an additional $150,-

000 it would not have had to spend had Mr. Park not embezzled the Holdback Amount.

Defendant adds that a seller's entitlement to receive interest on money held in escrow is a strong indication that the seller owns the money on which interest accrues. Plaintiff responds that the payment of interest does not indicate ownership but rather merely "indicates additional consideration to Bixby while the issue of the entitlement to funds was decided." In *Lischak v. Kotzer*, 96 Misc.2d 114, 408 N.Y.S.2d 996 (N.Y.Sup.Ct. 1978), both the buyer and seller claimed the right to the accrued interest on the money held back from the purchase price in escrow. The court held in favor of the seller and reasoned that the right to the accrued interest was an aspect of ownership. At the closing, the buyer took title to the property and title to the entire purchase price, including the amount held back, passed to the seller. Thus, at the time of the closing, the buyer relinquished title to the money held back, which formed part of the consideration paid to the seller for the sale of the property. *Id.* at 997–98. Plaintiff argues that *Lischak* is "not contrary because there the interest was paid on funds that unequivocally belonged to the seller." Again, plaintiff's analysis hinders rather than helps its position. In *Lischak*, as in this case, the funds unequivocally belonged to the seller because title to the funds held back passed to the seller at closing.

■ Finally, plaintiff's affirmative defenses of negligence and unclean hands are meritless. Defendant, plaintiff alleges, "failed to act with due diligence, and negligently and carelessly selected [Trico]. Any loss, therefore, was occasioned solely by the acts, errors and omissions of [defendant] in selecting [Trico] to hold the funds ... without verifying the financial solvency or stability of [Trico]." As proof of defendant's negligence, plaintiff quotes from defendant's December 16, 1994 audit investigation that "Trico Title was selected solely on the basis of the fact

---

6. 18 U.S.C. § 641 provides in part:
 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or

thing of value of the United States or any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof....

that they were the low bidder," and then adds that "[a]s usual one gets what one pays for." Plaintiff, however, neglects to explain why defendant's selection of the lowest bidder was negligent. A further reading of the report explains why Trico's bid was the lowest. The report states:

> Trico's exceptionally low bid of $10,000, to provide preliminary title reports, was attributable to the fact that, when the initial purchase order was issued in September 1991, "they were the only title company in Santa Barbara County that had access on site to an updated title plant that enabled them to do the title search in a cost and time effective manner."

Thus, contrary to plaintiff's assertion, the report does not indicate that defendant acted negligently in selecting Trico because they were the lowest bidder.[7]

 Assuming, *arguendo*, that defendant was negligent in selecting Trico as escrow holder for the $21.6 million, it is undisputed that defendant had offered to place the Holdback Amount in a noninterest-bearing government account. Plaintiff, however, insisted that the funds be held in an interest-bearing account and the parties thereafter agreed upon Trico as the escrow holder for the Holdback Amount. There is no evidence before the court, by affidavit or otherwise, that defendant's selection of Trico was in any way improper.[8] Moreover, plaintiff's reliance on the auditor's recommendation of safeguards to prevent this situation in future escrows as proof of defendant's negligence is misplaced.[9]

The Federal Rules of Evidence provide that subsequent remedial measures taken after an event are "not admissible to prove negligence or culpable conduct in connection with the event." Fed.R.Evid. 407.

 Plaintiff's second affirmative defense alleges that defendant acted with unclean hands in selecting Trico "to hold the funds that are the subject of this action." The doctrine of "unclean hands," which prevents a wrongdoer from succeeding in a court of equity, has its roots in the maxim: "He who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). Inexplicably, plaintiff argues that any loss occasioned by the use of Trico should fall upon defendant "because of its unclean hands and because as between *two innocent parties*, the United States and Bixby Ranch Company, the party most responsible for the loss should bear the loss." Plaintiff does not elaborate on how defendant could have unclean hands and still be an innocent party. Moreover, as noted above, it was at Bixby's request, not defendant's, that the Holdback Amount was held in escrow by Trico.

Indeed, plaintiff ignores the fact that its failure to provide clear title relative to the purchase by the Air Force of the easements in question set in motion the scenario which gave rise to the embezzlement of the funds in escrow. The Air Force was surely an innocent victim of plaintiff's failure to provide a

---

7. Indeed, the general rule is that an advertised government contract must be awarded to the lowest responsible bidder who submits a responsive bid. 1B McBride and Wachtel, Government Contracts § 10.20[2] at 10–68 (1996).

8. The audit report indicates that Trico was selected in part because:

> [T]he Deputy Assistant Secretary of the Air Force, who presumably was of the opinion that the [sic] Trico was a responsible escrow agent because they were then the designated underwritten agent for a major title insurance company approved by the Department of Justice. In addition, Trico had furnished all of the preliminary title reports and issued a title insurance binder. The preliminary title reports were indicative of several problems that had to be resolved in order to convey valid title. At

that time it was not known that the State of California's regulations pertaining to licensing of escrow agents are extremely lenient.

9. The auditor recommended that:

> [D]ue to the leniency of State of California regulations pertaining to the licensing of underwritten title companies to provide escrow services, the Real Estate regulations regarding Military funds be updated to provide specific guidance for the selection of title insurance companies and escrow agents, to include an in-depth review of escrow companies net worth and credibility.... [T]he Air Force could have specified that a third party agreement to be signed with the designated bank holder of the funds in order to preclude the bank from disbursing escrow funds without written Government consent.

clear title for the purchase of the restrictive easements. *See Stuart,* 619 A.2d at 1200. The court, therefore, rejects plaintiff's affirmative defenses.

## CONCLUSION

For the foregoing reasons the court denies plaintiff's motion for summary judgment and grants summary judgment in favor of defendant. Accordingly, the Clerk shall dismiss the complaint and enter judgment for defendant on its counterclaim in the amount of $150,000 plus simple interest thereon at the rate of 2.5 percent per annum until paid. No costs.